58 A.3d 705

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. ASKIA NASH, DEFENDANT–APPELLANT.

Argued October 23, 2012—Decided January 22, 2013.

 

*Adam W. Toraya,* Designated Counsel, argued the cause for appellant (*Joseph E. Krakora,* Public Defender, attorney).

*Barbara A. Rosenkrans,* Special Deputy Attorney General/Assistant County Prosecutor, argued the cause for respondent (*Carolyn A. Murray,* Acting Essex County Prosecutor, attorney).

Justice ALBIN delivered the opinion of the Court.

Our rules governing post-conviction relief are the last line of defense against a miscarriage of justice. In this case, we must determine whether a middle-school librarian convicted of aggravated sexual assault and endangering the welfare of a child is entitled to a new trial because exculpatory evidence—unknown to both the prosecutor and defense attorney—was not disclosed to the jury.

At a trial in 2002, J.B., a special-education student, testified that on three unspecified dates between 1999 and October 2000 when he was about twelve years old, defendant Askia Nash sexually assaulted him in the school bathroom. Nash not only denied the charge, but also insisted that he could not have committed the crime because an aide escorted J.B. around the school at all times. In rebuttal, the State called the school principal who testified that J.B. was not assigned a "personal" aide. That testimony undermined the main pillar of the defense and marked Nash as a liar. Nash was convicted of sexually assaulting J.B. and of endangering the welfare of another student who stated that the librarian had inappropriately touched his shoulders and buttocks.

In 2002 and 2005, Nash presented to the trial court newly discovered evidence—sworn or certified statements of school offi-

cials attesting that J.B. was assigned a "classroom" aide who accompanied him throughout the day. Those statements, including one by the principal himself, directly contradicted the thrust of the principal's trial testimony. The trial court denied Nash relief without conducting an evidentiary hearing on the claim of newly discovered evidence.

No appellate court has ever determined whether Nash is entitled to a new trial based on the newly discovered evidence mentioned above—not even in the present case where the issue was squarely raised in post-conviction-relief (PCR) proceedings. At a PCR hearing, J.B.'s classroom aide and special-education classroom teacher both testified, accounting for almost all of J.B.'s time during the day. If believed, their testimony strongly indicates that J.B. was never left alone in the bathroom and therefore Nash could not have committed the offense. The PCR court rejected Nash's ineffective-assistance-of-counsel and prosecutorial-misconduct arguments. It also rejected his newly discovered evidence argument on procedural grounds.

The Appellate Division affirmed the denial of relief based on ineffective assistance of counsel and prosecutorial misconduct. It did not address the newly discovered evidence issue. Indeed, neither the PCR court nor Appellate Division determined on the merits whether Nash was entitled to a new trial based on newly discovered evidence.

We now hold that evidence that J.B. was assigned an aide who accompanied him throughout most of the day—evidence not disclosed to the jury—is newly discovered evidence as defined by our jurisprudence. That evidence not only buttresses Nash's defense against J.B.'s charges, but also supports Nash's overall credibility, which was undermined by the principal's misleading trial testimony. We conclude that had that evidence been presented to the jury, the outcome of the case probably would have been different. Because the integrity of the verdict has been cast in doubt, a new trial must be ordered on all charges.

I.

Between 1995 and 2000, Nash was a licensed librarian and educational media specialist at the Morton Street Middle School in Newark. Nash taught a class of twenty-five to thirty students. Two special-education students in his class in October 2000 were J.B. and K.L., both twelve years old. The two students accused Nash of sexually abusing them.[1]

After a four-day jury trial in May 2002, Nash was convicted of two counts of first-degree aggravated sexual assault of J.B., *N.J.S.A.* 2C:14-2(a)(1); two counts of second-degree endangering the welfare of a child, J.B., *N.J.S.A.* 2C:24-4; one count of third-degree terroristic threats against J.B., *N.J.S.A.* 2C:12-3; and one count of second-degree endangering the welfare of a child, K.L., *N.J.S.A.* 2C:24-4.[2]

In large measure, the State's case turned on discrediting Nash's testimony that an aide accompanied J.B. during the school day. The State accomplished that objective by presenting the school's principal who testified that J.B. was not assigned a personal aide. The principal's testimony not only destroyed Nash's credibility, but also allowed the jury to believe that Nash had the opportunity to sexually assault J.B. in the school's bathroom. However, ten years after Nash's trial, it is all but indisputable that the principal's testimony was in error—that, in fact, J.B. was assigned a full-time aide during the period in question.

We begin with the trial testimony, which led to Nash's conviction.

### Testimony at Nash's Criminal Trial

J.B. testified that after he found a twenty-dollar bill, he agreed to loan Nash the money. Nash later repaid J.B. five dollars and

---

[1] By the time of trial, J.B.'s mother had commenced a lawsuit for money damages against the Newark Public School District as a result of the alleged molestation of her son.

[2] Nash was acquitted of sexually assaulting K.L., *N.J.S.A.* 2C:14-2(b).

told J.B. to meet him in the bathroom. According to J.B., while in the bathroom, Nash asked him to pull down his pants and then "put his finger inside [J.B.'s] butt." J.B. stated that similar incidents occurred two more times and that on one of the occasions J.B. was directed to touch Nash's penis. All three incidents happened on unspecified dates sometime between 1999 and October 2000. Not until October 2000 did J.B. tell his mother about the sexual assaults. He explained that he did not come forward sooner because Nash had threatened "to get [his] mom" if he reported the abuse. However, he did complain to his mother months earlier about pain in his rectal area.

J.B.'s mother testified that she took her son to Beth Israel Hospital after he told her about the sexual abuse. At the hospital, Dr. Gloria Jacome examined J.B. Dr. Jacome testified that J.B. had a rectal fissure, redness in the rectal area, and a "rectal sphincter tone [that] was easily dilated." Dr. Jacome learned not only about the nature of the abuse allegations but also that J.B. had suffered from a recent bout of constipation. Dr. Jacome gave alternative causes for the conditions in J.B.'s rectal area—constipation or trauma from a sexual assault. Although sexual abuse was consistent with the conditions she observed, Dr. Jacome could not conclude that it was the cause.

K.L. testified that, on one occasion when Nash kept him after class to stock books in the library, Nash rubbed his shoulders, "touched [his] butt on purpose[,]" and he "felt uncomfortable."

J.B.'s classroom teacher, Saundra Sharp–Conte, testified that J.B. often attempted to get out of class by asking to go to see the art teacher or go to the library or bathroom. Sharp–Conte allowed J.B. to go to the bathroom, but she was not asked and did not state whether J.B. went alone or was accompanied by an adult or fellow students.

Nash took the stand and denied sexually assaulting or inappropriately touching J.B. and K.L. Nash explained that because J.B. was a special-needs student and had disciplinary problems, he was assigned an aide, Crystal St. Louis. Specifically, Nash testified

that either an adult or non-special-needs student accompanied J.B. to the bathroom. Nash insisted that he never escorted a student to the bathroom. Moreover, he indicated that J.B. was "escorted throughout the building with aides" and "to and from every classroom with aides."

In rebuttal, the State called as its last witness Carl Gregory, the principal of the Morton Street Middle School. In response to questions posed by the prosecutor, Gregory stated that J.B. was not assigned a "personal aide" and that only one such aide was employed at the school. Gregory defined a personal aide as a person who "work[s] with a particular student throughout the day," providing instruction, tutoring, and nurturing. Neither the prosecutor nor defense attorney asked Gregory whether J.B. was assigned any other category of aide who shadowed him during the day, and Gregory did not discuss "classroom" aides.

Gregory's rebuttal had devastating consequences for the defense. In summation, defense counsel accepted Gregory's testimony as the truth and conceded that Nash had erred in asserting that J.B. had been assigned an aide. Backpedaling, defense counsel explained: "Does that mean that Askia Nash is lying? No. That he may have been mistaken about this one boy? Yes."

The jury found Nash guilty of, among other things, aggravated sexual assault of J.B. and endangering the welfare of K.L. Nash was sentenced to an aggregate term of twenty-two years in State Prison for those offenses.[3]

### First New–Trial Motion

In June 2002, before sentencing, Nash filed a pro se motion for a new trial primarily based on ineffective assistance of counsel. Nash contended that his attorney failed both to elicit psychological

---

[3] Defendant was sentenced to two concurrent fifteen-year terms for the aggravated sexual assaults against J.B. and to a consecutive seven-year term for endangering the welfare of K.L. The court also imposed a concurrent four-year term for terroristic threats against J.B. and two concurrent seven-year terms for endangering the welfare of J.B.

and medical information bearing on J.B.'s mental status and to challenge the false testimony that J.B. had no aide. In his own handwriting, Nash stated that "[a]nyone knows that students with ... [J.B.'s] classification have classroom aides. The aides were willing to testify to this [but] counsel failed me by not having them present."

Nash retained a new attorney to prosecute this motion. The trial court conducted a three-day evidentiary hearing to determine whether counsel was derelict in not presenting evidence that J.B. suffered from schizophrenia. Ultimately, the court rejected the diagnosis of one expert—contradicted by three other experts—that J.B. was afflicted with schizophrenia.

Nash also submitted three affidavits attesting that an aide escorted J.B. throughout the day. The affidavits directly refuted Principal Gregory's trial testimony.

In her July 2002 affidavit, Crystal St. Louis—a classroom aide at the Morton Street School—averred that she was assigned to J.B. for the year 2000–2001 by the principal and "regularly supervised [J.B.] when he was in his instructional classes." Vanessa Johnson–Shavers stated in her June 2002 affidavit that she was an aide to J.B. during the same 2000–2001 term and "regularly supervised [him] when he travelled throughout the school from period to period and to and from and during classes and activity periods such as 'Library.'" The Morton Street School's vice principal, Mary Ann Torelli, similarly averred in an affidavit that St. Louis and Johnson–Shavers "worked with and sometimes supervised" J.B. during the 1999–2000 school year. She further stated that J.B. "could never be trusted to be alone because he ... exhibited behavior problems, such as telling lies." Each affidavit conveyed similar themes: a teacher, student, or aide monitored J.B. when he went to the door of a bathroom, and J.B. had a reputation for untruthfulness whereas Nash had one for honesty.

The court did not conduct an evidentiary hearing based on these affidavits. The court denied the new-trial motion based on inef-

fective assistance of counsel because of the time bar of *Rule* 3:20–2 and because counsel's failure to call St. Louis, Johnson–Shavers, and Torelli was not constitutionally deficient or prejudicial under *Strickland v. Washington,* 466 *U.S.* 668, 687, 104 *S.Ct.* 2052, 2064, 80 *L.Ed.*2d 674, 693 (1984).

Although Nash did not seek a new trial based on newly discovered evidence, the court raised the issue on its own. Applying the three-prong test set forth in *State v. Carter,* 85 *N.J.* 300, 314, 426 *A.*2d 501 (1981), the court found the evidence revealed in the affidavits to be merely cumulative or impeaching (prong one) and to have been discoverable through reasonable diligence (prong two). *Ibid.* (citations omitted). However, the court found the third prong of the *Carter* test "likely to be satisfied"—that is, the court believed that the evidence was "of the sort that would probably change the jury's verdict if a new trial were granted." *Ibid.* (citations omitted). Because all three prongs of the test were not satisfied, the court denied Nash a new trial.

Nash, through his attorney, appealed his conviction and portions of the denial of his new-trial motion. He did not appeal the court's denial of a new trial based on the newly discovered evidence presented in the affidavits of St. Louis, Johnson–Shavers, and Torelli. Nash's conviction was affirmed on appeal.

*Second New–Trial Motion*

In 2005, through yet another attorney, Nash filed a new-trial motion based on newly discovered evidence secured during civil litigation instituted by J.B.'s mother against the Newark Public School District. That evidence consisted of certifications by Morton Street School officials that dispelled any notion that J.B. was not assigned an aide during the period in question.[4]

In his December 2004 certification, Principal Carl Gregory clarified his trial testimony, averring that an aide, in fact, moni-

---

[4] The certifications were prepared in support of the School District's summary-judgment motion in the civil litigation.

tored J.B. Gregory explained that both personal aides and class-room aides were employed at the Morton Street School. Whereas a personal aide was assigned specifically to a special-needs student as part of an individualized education plan, a classroom aide was assigned to a special-needs class as a whole. Crystal St. Louis was a classroom aide assigned to J.B.'s classroom. "Towards the end of the 1999–2000 school year, [Gregory] instructed Ms. St. Louis to focus specifically on J.B. . . . and to accompany him during the day, which she did." Gregory instructed St. Louis to do the same during the 2000–2001 school year. Despite her one-on-one role with J.B., St. Louis "was not officially reassigned as a personal aide." According to Gregory, at the criminal trial he responded to the precise questions posed to him about the func-tion of a personal aide, but had he been given the opportunity to answer more expansively, he would have disclosed that "St. Louis was a classroom aide whose instructions in this capacity were to focus her efforts on J.B. and to accompany him during the day."

In her 2004 certification, St. Louis provided greater detail than contained in her 2002 affidavit about her supervisory role over J.B. Although St. Louis was Sharp–Conte's "classroom aide," the school principal instructed her toward the end of the 1999–2000 school year to work directly with J.B. She continued in that role into the following school year. In that capacity, she "was with J.B. the entire school day, except for the half hour when [she] took [her] lunch at which point he was with" Sharpe–Conte. St. Louis "accompanied J.B. everywhere he went." In particular, when J.B. went to the bathroom outside "regularly scheduled times," St. Louis escorted or monitored him and sent another student into the bathroom with him. J.B. never expressed a desire to be excused from library periods or "complained about Mr. Nash," and St. Louis never observed any "unusual interaction" between J.B. and Nash. The student who accompanied J.B. into the bathroom never reported to St. Louis the occurrence of a sexual assault.

Sharp–Conte, in her 2004 certification, recalled that J.B. was a student in her special-education classroom during the 1999–2000

school year and into the 2000–2001 school year. Although St. Louis was designated as a classroom aide, she was instructed to work directly with J.B. toward the end of the 1999–2000 school year. St. Louis escorted J.B. from Sharp–Conte's "classroom to his other classes." According to Sharp–Conte, the special-education students were taken to "the bathroom at regularly scheduled times throughout the day." However, when J.B. needed to use the bathroom at other times, the procedure described by St. Louis earlier was followed, and J.B. was closely monitored. During St. Louis's half-hour lunch break, J.B. remained with Sharp–Conte "in the classroom along with the rest of the class." Sharp–Conte also verified that J.B. never expressed an unwillingness to attend library classes and never appeared upset after returning from the library or bathroom. Before his October 2000 complaint, J.B. never alleged to her that Nash had sexually assaulted him. Sharp–Conte noted that J.B. would generally speak to her about issues that bothered him.

By order dated November 17, 2005, the trial court denied the new-trial motion and the alternative request for an evidentiary hearing. The order provides no explanation for the denial of the motion, and we have been provided with no transcript setting forth the court's reasons. The denial of this new-trial motion was not appealed.

### Petition for Post–Conviction Relief

In May 2006, Nash filed a PCR petition alleging that he was denied a fair trial because of ineffective assistance of counsel, prosecutorial misconduct, and perjured testimony. In August 2007, without holding an evidentiary hearing, the trial court denied the petition. In particular, the court rejected Nash's claim that his trial attorney provided constitutionally deficient representation, concluding that "reasonable trial strategy ... cannot be questioned after the fact[.]" The court, however, mistakenly believed that Principal Gregory had testified at trial that J.B. "was escorted by adults at all times."

### Appellate Division I

In August 2009, the Appellate Division reversed. The appellate panel emphasized that the PCR judge came to an erroneous factual conclusion concerning Gregory's trial testimony. Correcting the record, the panel stated that, in his rebuttal testimony, Gregory "denied that an escort was assigned to J.B., thereby severely undercutting [the defense]." The panel held that Nash had "made a prima facie showing of ineffectiveness of counsel" based on the failure to elicit exculpatory testimony and a showing "of prosecutorial misconduct arising from the presentation of misleading testimony by Gregory on the subject of the assignment of an aide to J.B." It ordered a remand for an evidentiary hearing on both issues. Last, the panel left "for consideration by the trial court any motion for a new trial that defendant may seek to make at this time premised upon the existence of newly-discovered evidence."

### PCR Evidentiary Hearing

In February and March 2010, the PCR court conducted a three-day evidentiary hearing.[5] At the outset, it was understood that the hearing would encompass Nash's claims of ineffective assistance of counsel, prosecutorial misconduct, and newly discovered evidence. In all, six witnesses testified at the hearing: St. Louis, Sharp–Conte, Johnson–Shavers, Nash, Nash's trial attorney, and the trial prosecutor.[6]

St. Louis elaborated on her 2002 affidavit and 2004 certification. Although she was hired as a special-needs classroom aide, the principal ordered her to act as a one-on-one aide to J.B. after he attempted to jump off the roof of the school building. St. Louis was instructed to follow J.B. "everywhere he went" and told that "if anything happens to him it's on [you]." When J.B. went to the

---

[5] Up to this point, the judge who presided at trial had heard all post-trial motions and petitions. After his transfer to another county, a different judge presided over the PCR evidentiary hearing.

[6] By the time of the PCR hearing, the principal, Carl Gregory, had died.

bathroom, St. Louis always sent another student in with him while she stood outside. The student who accompanied J.B. was to report to her any incidents in the bathroom. He never reported an occurrence of sexual molestation. St. Louis escorted J.B. to all his classes, including the library. During her thirty-minute lunch break, J.B. remained with his classroom teacher. St. Louis stated that after the sexual assault complaint, the principal imposed a "gag order" and told her not to respond to questions concerning the matter. She did, however, tell Nash's defense attorney that she would be willing to testify, but he never contacted her.

Sharp–Conte, J.B.'s special-education classroom teacher, confirmed the incident of J.B. walking "along the edge of the roof" and Gregory's gag order. She also confirmed that St. Louis was J.B.'s aide, monitoring him and sending a student to accompany J.B. into the bathroom.[7] Sharp–Conte referred to J.B. as a "troubled child" who "was known to be a pathological liar. He always [made] up stories." She explained that she never informed the prosecutor's office that St. Louis was a full-time aide to J.B. because she was never asked a question on the subject.

Nash testified that he never touched J.B. inappropriately. He knew that St. Louis served as J.B.'s aide and was with him at all times, even though at the time of trial he was unaware of the distinction between a personal and classroom aide. He "pleaded" with his trial attorney to call St. Louis as a witness but was told that St. Louis was uncooperative and would have to be subpoenaed, and that would cost more money. Nash also told his attorney to call Vice Principal Torelli and a resource teacher named Ida Jenkins because they knew that J.B. had a full-time aide. For example, Ms. Torelli had told Nash and other teachers that J.B. was "not to step into [their] class without Ms. St. Louis. That's policy." After Principal Gregory testified at trial in rebut-

---

[7] To show possible bias, the prosecutor elicited from Sharp–Conte that she was named as a defendant in J.B.'s mother's lawsuit. It bears mentioning, however, that St. Louis was not named as a defendant in that civil action.

tal, Nash told his attorney, "he's not telling the truth. . . . [P]lease get Ms. St. Louis in here." No witnesses, however, were called to contradict Gregory's account that J.B. was not assigned a personal aide. Moreover, Nash's appellate attorney—although aware that witnesses were available to counter Gregory's testimony based on the affidavits filed in support of the new-trial motion—never raised the newly discovered evidence issue before the Appellate Division on direct appeal.

According to Nash's trial attorney, Nash said that he could not have committed the crime because an aide—St. Louis—escorted J.B. everywhere in the building. The presence of an aide shadowing J.B. became the main defense. Nash provided the defense attorney with the names of St. Louis, Vice Principal Torelli, and Ida Jenkins as potential witnesses. Although the defense attorney recognized that retaining an investigator before trial is "extremely important," Nash did not have the resources to do so, and therefore the attorney or his staff made contact with the witnesses. The attorney contacted St. Louis but "she did not want to get involved." She imparted that, if subpoenaed, "I'm going to say things about your client that you're not going to like." For that reason, he decided not to chance calling her as a witness. On the other hand, the defense attorney acknowledged that had St. Louis stated before Nash's criminal trial that she was J.B.'s one-on-one aide, as she did in her 2004 certification, that would have been his "ace in the hole." In that circumstance, he would have presented the information to the prosecutor's office, and then "[the prosecutor] may have walked away from the case."

The defense attorney contended that he did not call Ida Jenkins because Jenkins had complained about Nash taking students out of the classroom. He did not call Vice Principal Torelli as a witness because he was unable to contact her, either by telephone or mail. Likewise, Sharp–Conte did not return any of his telephone calls, and he was not able to interview her before trial. The defense attorney, moreover, did not cross-examine Sharp–Conte about whether J.B. was assigned an aide because he was uncertain

how she would respond. He declined to call as a witness Johnson–Shavers, who assisted Nash in the library, because she told him during an interview that she did not escort children to the bathroom, but rather she gave them a pass. Last, the defense attorney did not challenge Principal Gregory on cross-examination because the attorney did not know about the distinction between personal and classroom aides and because he was afraid that questioning Gregory would open the door to unfavorable testimony, including testimony about Nash's presence with students alone in the hallways and calling students to the library.

The trial prosecutor stated that she called Principal Gregory to rebut Nash's trial assertions that an aide escorted J.B. throughout the day. When Gregory testified that J.B. was not assigned a personal aide, she did not know the distinction between personal and classroom aides. She had no knowledge of the exculpatory information contained in the civil certifications and, if she had, she would have turned it over to the defense. Moreover, the prosecutor admitted that had there been information at the time of trial that someone supervised J.B. "all the time[,] . . . it would probably have been a very different case." [8]

### PCR Court's Decision

The PCR court denied Nash's petition for relief. First, the court found that counsel was not constitutionally ineffective. The court determined that defense counsel's decisions not to call St. Louis as a witness and not to cross-examine both Sharp–Conte and Gregory about whether an aide escorted J.B. were strategic choices entitled to deference. The court maintained that counsel's overall performance did not fall outside of "the wide range of reasonable professional assistance" that is acceptable under the Sixth Amendment of the United States Constitution. *Strickland, supra,* 466 *U.S.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694. The court also concluded that the proposed testimony from the un-

---

[8] The court called Johnson–Shavers as a witness, but her testimony presented no relevant information that shed light on the issues before the PCR court.

called witnesses "contributed nothing substantively new" and "would not have overcome the overwhelming evidence" of guilt.

Second, the PCR court rejected the argument that Nash was denied a fair trial because of prosecutorial misconduct. From the court's perspective, nothing in the record indicated that the prosecutor possessed evidence or knowledge that J.B. was assigned an aide or that the Morton Street School had different types of aides. Additionally, the court found no support for the notion that the prosecutor "manipulated the testimony of Mr. Gregory to create the perception that no aide escorted J.B."

Last, it held that the rules governing post-conviction relief procedurally barred Nash's ineffective-assistance-of-counsel and newly discovered evidence claims. Specifically, the court stated that *Rule* 3:22–5 barred Nash from relitigating the 2002 denial of his ineffective-assistance-of-counsel claim and the 2002 and 2005 denial of his newly discovered evidence claims, and that *Rule* 3:22–4 barred Nash from raising the newly discovered evidence issue because he could have raised it on direct appeal. Nevertheless, there was "no question in [the PCR] court's mind that Miss St. Louis was someone charged with the responsibility of following JB or keeping an eye on JB."

*Appellate Division II*

The Appellate Division affirmed the ultimate findings of the PCR court that Nash was not denied a fair trial based on ineffective assistance of counsel or prosecutorial misconduct. However, the appellate panel recognized that the 2004 certifications of St. Louis, Sharp–Conte, and Gregory, "if produced at an earlier time, would have served to support defendant's case." The panel also accepted "that such material was not available to counsel at the time of trial," and therefore Nash failed to satisfy the deficiency prong of *Strickland*. The panel declined to reach the *Strickland* prejudice prong for it was unnecessary to its resolution of the appeal. The panel also declined to decide whether the PCR petition was procedurally barred by *Rules* 3:22–

4 and 3:22–5. The appellate panel never addressed whether Nash was entitled to PCR relief based on newly discovered evidence.

We granted Nash's petition for certification. *State v. Nash,* 208 *N.J.* 597, 34 *A.*3d 779 (2011).

## II.

Our system of criminal justice is not infallible. For that reason, our rules governing post-conviction relief provide a built-in "safeguard that ensures that a defendant was not unjustly convicted." *State v. McQuaid,* 147 *N.J.* 464, 482, 688 *A.*2d 584 (1997). Ultimately, a PCR petition is a defendant's last chance to challenge the "fairness and reliability of a criminal verdict in our state system." *State v. Feaster,* 184 *N.J.* 235, 249, 877 *A.*2d 229 (2005) (citing *State v. Rue,* 175 *N.J.* 1, 18, 811 *A.*2d 425 (2002)). If an error led to a miscarriage of justice in an earlier trial, the PCR proceeding must provide a meaningful opportunity to root it out. *State v. Hess,* 207 *N.J.* 123, 144–45, 23 *A.*3d 373 (2011).

Our standard of review is necessarily deferential to a PCR court's factual findings based on its review of live witness testimony. In such circumstances we will uphold the PCR court's findings that are supported by sufficient credible evidence in the record. *See State v. Harris,* 181 *N.J.* 391, 415, 859 *A.*2d 364 (2004), *cert. denied,* 545 *U.S.* 1145, 125 *S.Ct.* 2973, 162 *L.Ed.*2d 898 (2005) (citing *Toll Bros., Inc. v. Twp. of W. Windsor,* 173 *N.J.* 502, 549, 803 *A.*2d 53 (2002)); *State v. Elders,* 192 *N.J.* 224, 244, 927 *A.*2d 1250 (2007) ("An appellate court 'should give deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses . . . .' " (quoting *State v. Johnson,* 42 *N.J.* 146, 161, 199 *A.*2d 809 (1964))). An appellate court's reading of a cold record is a pale substitute for a trial judge's assessment of the credibility of a witness he has observed firsthand. *See State v. Locurto,* 157 *N.J.* 463, 474, 724 *A.*2d 234 (1999) (citations omitted). Last, we need not defer to a PCR court's interpretation of the law; a legal conclusion is

reviewed de novo. *Harris, supra,* 181 *N.J.* at 415–16, 859 *A.*2d 364 (citing *Toll Bros., supra,* 173 *N.J.* at 549, 803 *A.*2d 53).

A jury verdict that has been upheld on appeal "should not be disturbed except for the clearest of reasons." *State v. Ways,* 180 *N.J.* 171, 187, 850 *A.*2d 440 (2004). Therefore, at a PCR hearing, the burden is on the petitioner to establish his right to "relief by a preponderance of the credible evidence." *State v. Preciose,* 129 *N.J.* 451, 459, 609 *A.*2d 1280 (1992) (citations omitted).

In this appeal from the denial of post-conviction relief, Nash raises three separate issues. He claims that exculpatory information was denied to the jury because of ineffective assistance of counsel and prosecutorial misconduct. Alternatively, Nash argues that newly discovered evidence clearly shows that a full-time aide supervised J.B., just as Nash had testified at trial. Nash asserts that Gregory's misleading testimony that a personal aide was not assigned to J.B. critically undercut the defense and led to an unjust conviction. For these reasons, Nash claims that he is entitled to a new trial.

We begin with Nash's ineffective-assistance claim.

### III.

### A.

The Sixth Amendment of the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution both guarantee that, in a criminal proceeding, the accused shall have the right to the assistance of counsel in his defense. *U.S. Const.* amend. VI.; *N.J. Const.* art. I, ¶ 10. Our jurisprudence recognizes that the right to counsel encompasses " 'the right to the effective assistance of counsel.' " *Strickland, supra,* 466 *U.S.* at 686, 104 *S.Ct.* at 2063, 80 *L.Ed.*2d at 692 (quoting *McMann v. Richardson,* 397 *U.S.* 759, 771 n. 14, 90 *S.Ct.* 1441, 1449 n. 14, 25 *L.Ed.*2d 763, 773 n. 14 (1970)); *State v. Fritz,* 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987) (adopting standard in *Strickland* ). A defendant

whose counsel is ineffective within the meaning of the constitution is deprived of an invaluable right that is essential to a fair trial. *Strickland, supra,* 466 *U.S.* at 684–85, 104 *S.Ct.* at 2063–64, 80 *L.Ed.*2d at 691–92.

To establish constitutional ineffectiveness, a defendant must first show that "counsel's performance was deficient." *Id.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693. A deficient performance means that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Ibid.* Second, a "defendant must show that the deficient performance prejudiced the defense." *Ibid.* Prejudice means "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Ibid.* When a defendant meets both prongs of *Strickland,* a conviction must be reversed because the ineffective representation constitutes "a breakdown in the adversary process that renders the result unreliable." *Ibid.*

In the present case, the Appellate Division addressed only prong one. To satisfy prong one, Nash had to "overcome a 'strong presumption' that counsel exercised 'reasonable professional judgment' and 'sound trial strategy' in fulfilling his responsibilities." *Hess, supra,* 207 *N.J.* at 147, 23 *A.*3d 373 (quoting *Strickland, supra,* 466 *U.S.* at 689–90, 104 *S.Ct.* at 2065–66, 80 *L.Ed.*2d at 694–95). "[I]f counsel makes a thorough investigation of the law and facts and considers all likely options, counsel's trial strategy is 'virtually unchallengeable.'" *State v. Chew,* 179 *N.J.* 186, 217, 844 *A.*2d 487 (2004) (quoting *Strickland, supra,* 466 *U.S.* at 690–91, 104 *S.Ct.* at 2065–66, 80 *L.Ed.*2d at 695). Mere dissatisfaction with a " 'counsel's exercise of judgment' " is insufficient to warrant overturning a conviction. *State v. Echols,* 199 *N.J.* 344, 358, 972 *A.*2d 1091 (2009) (quoting *State v. Castagna,* 187 *N.J.* 293, 314, 901 *A.*2d 363 (2006)).

## B.

In light of our constitutional jurisprudence and deferential standard of review, we concur with the PCR court's deter-

mination that Nash's trial counsel did not render constitutionally deficient performance. The test is not whether defense counsel could have done better, but whether he met the constitutional threshold for effectiveness. *See Fritz, supra,* 105 *N.J.* at 52, 519 *A.2d* 336 (citing *Strickland, supra,* 466 *U.S.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.2d* at 693). Here, according to defense counsel, his investigation was thwarted by the lack of cooperation of school officials. Witnesses, such as classroom aide St. Louis and Principal Gregory, refused to talk to defense counsel, and Vice Principal Torelli refused to return his calls and letters. Likewise, J.B.'s special-education classroom teacher, Sharp–Conte, did not return calls and declined to be interviewed. From the beginning, Nash told his attorney that an aide followed J.B. everywhere. Nonetheless, defense counsel could not corroborate this important fact through his own investigatory efforts. As we now know, Gregory's gag order had the probable effect of interfering with trial counsel's investigation and defense.

When the State presented its case-in-chief, defense counsel did not question Sharp–Conte about an aide, fearful that he might elicit an answer that would undermine his defense. Gregory's rebuttal testimony that J.B. did not have a personal aide came from the principal—the foremost authority figure in the school. That testimony evidently caught defense counsel flat-footed. Not knowing the difference between a classroom and personal aide, counsel made the strategic decision not to reinforce testimony that proved damning.

 The PCR court heard defense counsel's extensive testimony. The court concluded that, even with limited financial resources, counsel made a reasonably diligent investigation. Defense counsel cannot be faulted if he was stonewalled. Courts are cautioned to avoid looking at events through the distorting lens of hindsight and second-guessing reasonable decisions made by counsel. *Strickland, supra,* 466 *U.S.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.2d* at 694. There is sufficient credible evidence in the record to support the PCR court's conclusion that defense counsel's

performance was not constitutionally deficient. For that reason, we need not consider the prejudice prong of *Strickland*.

We next consider Nash's claim of prosecutorial misconduct.

## IV.

### A.

A prosecutor's obligation to "turn over material, exculpatory evidence to the defendant" is well established and does not require extended discussion. *See State v. Morton*, 155 *N.J.* 383, 413, 715 *A.*2d 228 (1998), *cert. denied*, 532 *U.S.* 931, 121 *S.Ct.* 1380, 149 *L.Ed.*2d 306 (2001). The obligation extends as well to impeachment evidence within the prosecution's possession. *Strickler v. Greene*, 527 *U.S.* 263, 280, 119 *S.Ct.* 1936, 1948, 144 *L.Ed.*2d 286, 301 (1999) (citing *United States v. Bagley*, 473 *U.S.* 667, 676, 105 *S.Ct.* 3375, 3380, 87 *L.Ed.*2d 481, 490 (1985)); *see also State v. Nelson*, 155 *N.J.* 487, 497–98, 715 *A.*2d 281 (1998), *cert. denied*, 525 *U.S.* 1114, 119 *S.Ct.* 890, 142 *L.Ed.*2d 788 (1999). A breach of this duty of disclosure—in appropriate circumstances—violates a defendant's due process rights. *Brady v. Maryland*, 373 *U.S.* 83, 87, 83 *S.Ct.* 1194, 1196–97, 10 *L.Ed.*2d 215, 218 (1963). However, the due-process guarantee does not impose on a prosecutor a constitutional duty to investigate. *See Nelson, supra*, 155 *N.J.* at 498, 715 *A.*2d 281 (citing *Calley v. Callaway*, 519 *F.*2d 184, 223 (5th Cir.1975)).

### B.

With these simple principles in mind, we turn to Nash's argument. Nash contends that the prosecutor knew or must have known that J.B. was assigned an aide, withheld that information from him, and then—through precision questioning of Gregory—misled the jury to believe that J.B. had no aide. However, the PCR court found the testimony of the prosecutor to be credible. The prosecutor testified that during her investigation she did not learn about an aide assigned to J.B. It was not until Nash's

testimony that she heard first that J.B. was monitored by an aide and that he was not roaming freely through the halls of the school. The prosecutor, in rebuttal, called Principal Gregory who parsed his words finely when he told the jury that J.B. was not assigned a *personal* aide. The PCR court accepted the prosecutor's explanation that she was unaware of the distinction between a *personal* and *classroom* aide, did not know that J.B. had been assigned any type of aide, and would have disclosed information to the defense had she known that J.B. was monitored. Indeed, the prosecutor conceded that had the same information contained in the civil certifications been disclosed to the jury "it would probably have been a very different case."

We have no basis to second-guess the credibility finding of the PCR court that the prosecutor did not withhold exculpatory information within her knowledge or possession. The PCR court's determination is supported by sufficient credible evidence in the record.

Finally, we address Nash's contention that he was entitled to a new trial based on newly discovered evidence.

## V.

### A.

The PCR court dismissed Nash's newly discovered evidence claim on the ground that it was procedurally barred by *Rules* 3:22–4 and 3:22–5. The Appellate Division failed to address in any way the newly discovered evidence claim, procedurally or substantively. The sidestepping of that issue is perplexing because, after the PCR court initially declined to hold an evidentiary hearing, the Appellate Division remanded "for consideration by the trial court [of] any motion for a new trial that defendant may seek to make at this time premised upon the existence of newly-discovered evidence." Defense counsel followed this cue and filed the newly discovered evidence motion, which was procedurally denied by the PCR court and then ignored by the Appellate Division.

The newly discovered evidence issue has taken a tortuous path, evading substantive consideration and appellate review for ten years. Along the way there have been missteps and missed opportunities that have contributed to this issue never receiving a full airing. The importance of the issue demands our review.

 A petitioner is generally barred from presenting a claim on PCR that could have been raised at trial or on direct appeal, *R.* 3:22–4(a),[9] or that has been previously litigated, *R.* 3:22–5.[10] Neither rule, however, requires this Court to acquiesce to a miscarriage of justice.

 The PCR court will not enforce *Rule* 3:22–4's bar if "the ground for relief not previously asserted could not reasonably have been raised in any prior proceeding" or if "enforcement of the bar … would result in fundamental injustice." *R.* 3:22–4(a)(1) and (2).[11] The first exception is only available to a petitioner if he can show that the facts that form the basis for relief "could not have been discovered earlier through the exercise of reasonable diligence." *R.* 3:22–4(a). The second exception turns on the definition of "fundamental injustice." *R.* 3:22–4(a)(2). Our courts will find fundamental injustice when the judicial system has denied a "defendant with fair proceedings leading to a just outcome" or when "inadvertent errors mistakenly impacted a determination of guilt or otherwise wrought a miscarriage of justice." *State v. Mitchell,* 126 *N.J.* 565, 587, 601 *A.2d* 198 (1992) (internal quotations omitted) (citing *State v. Laurick,* 120 *N.J.* 1, 10, 575 *A.2d* 1340, *cert. denied,* 498 *U.S.* 967, 111 *S.Ct.* 429, 112 *L.Ed.2d* 413

---

[9] *Rule* 3:22–4(a) provides in relevant part that "[a]ny ground for relief not raised in the proceedings resulting in the conviction … or in any appeal taken in any such proceedings is barred from assertion in a [PCR] proceeding."

[10] *Rule* 3:22–5 provides that "[a] prior adjudication upon the merits of any ground for relief is conclusive whether made in the proceedings resulting in the conviction or in any post-conviction proceeding … or in any appeal taken from such proceedings."

[11] A third exception to *Rule* 3:22–4 is not relevant here. *R.* 3:22–4(a)(3).

(1990)). To succeed on a fundamental-injustice claim, the petitioner must make " 'some showing' " that an error or violation " 'played a role in the determination of guilt.' " *Ibid.* (quoting *Laurick, supra,* 120 *N.J.* at 13, 575 *A.2d* 1340).

Moreover, *Rule* 3:22–5's bar to review of a prior claim litigated on the merits "is not an inflexible command." *State v. Franklin,* 184 *N.J.* 516, 528, 878 *A.2d* 757 (2005). For example, this rule does not prohibit a claim for relief based on newly discovered evidence. *See R.* 3:20–2; *cf. Ways, supra,* 180 *N.J.* at 187, 850 *A.2d* 440 (citing *Carter, supra,* 85 *N.J.* at 314, 426 *A.2d* 501). Under either rule, our courts are not powerless to correct a fundamental injustice. This Court will not yield to an injustice merely because no court has yet to address in any meaningful way the issue of newly discovered evidence.

Although Nash's newly discovered evidence has been repeatedly presented in the form of verified statements of material witnesses, no court has ever considered the issue on the merits in the context of an evidentiary hearing. In 2002, after his conviction, Nash presented to the trial court three affidavits contradicting Principal Gregory's testimony that a personal aide was not assigned to J.B. Despite the strength of the affidavits, inexplicably, Nash's attorney did not move for a new trial based on newly discovered evidence. Nevertheless, the trial court on its own considered whether the affidavits warranted the granting of a new trial.

Having raised the issue, the trial court did not convene an evidentiary hearing to determine whether the information presented by Vice Principal Torelli or the aides, St. Louis and Johnson–Shavers, would have been available through the reasonable diligence of Nash's trial counsel or would have been sufficient to change the outcome of the verdict. Instead, based on nothing more than the bare affidavits, the court concluded that trial counsel, exercising reasonable diligence, could have called these witnesses. The court arrived at this conclusion without ever

asking defense counsel why he did not call Torelli, St. Louis, or Johnson–Shavers as witnesses.

Significantly, the PCR court that conducted an evidentiary hearing in 2009 determined, in effect, that trial counsel exercised reasonable diligence and could not secure the cooperation of the witnesses. Several witnesses at the PCR hearing testified that Principal Gregory had imposed a gag order, lending credence to the notion that defense counsel had been stonewalled. It may well be that the trial court's sua sponte consideration of the newly discovered evidence would have led to the grant of a new trial had an evidentiary hearing been conducted in 2002 and the court recognized that the evidence was not cumulative, impeaching, or contradictory. What makes that point all the more plausible is that the trial court believed that the sworn statements in the affidavits were the sort of evidence "that would probably change the jury's verdict if a new trial was granted."

In 2005, the trial court again denied a new-trial motion or evidentiary hearing, despite the certifications of Principal Gregory; J.B.'s classroom teacher, Sharp–Conte; and J.B.'s aide, St. Louis. All averred that J.B. was monitored throughout the day, thus suggesting a real potential that Nash may not have committed the offense. The court's reason for denying relief is not contained in its order or in any transcript filed with this Court. Moreover, nothing in the record clearly explains why an appeal was not taken from the court's denial.

In 2009, based only on procedural grounds, the PCR court denied a new trial premised on newly discovered evidence. The PCR court came to that conclusion even while holding that defense counsel exercising reasonable diligence could not have secured the exculpatory evidence. The Appellate Division did not address the PCR court's denial of relief based on newly discovered evidence.

Substantive consideration of Nash's newly discovered evidence claim has evaded review for ten years. It would be a fundamental injustice for this Court not to review the issue now. We therefore

turn to the jurisprudence that governs a motion for a new trial based on newly discovered evidence.

B.

In *Carter, supra,* we repeated the well-established standard for granting a new trial based on newly discovered evidence. 85 *N.J.* at 314, 426 *A.*2d 501. Evidence is newly discovered and sufficient to warrant the grant of a new trial when it is "(1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted." *Ibid.*

In *Ways, supra,* we further refined the newly discovered evidence standard. 180 *N.J.* at 187–93, 850 *A.*2d 440. Under prong one of the *Carter* test, "[m]aterial evidence is any evidence that would have some bearing on the claims being advanced," and includes evidence that supports a general denial of guilt. *Id.* at 188, 850 *A.*2d 440 (internal quotation marks and citation omitted). Moreover, "[d]etermining whether evidence is 'merely cumulative, or impeaching, or contradictory,'" necessarily implicates prong three, "whether the evidence is 'of the sort that would probably change the jury's verdict if a new trial were granted.'" *Id.* at 188–89, 850 *A.*2d 440 (quoting *Carter, supra,* 85 *N.J.* at 314, 426 *A.*2d 501). We have declared that "evidence that would have the probable effect of raising a reasonable doubt as to the defendant's guilt would not be considered merely cumulative, impeaching, or contradictory." *Id.* at 189, 850 *A.*2d 440 (citation omitted). As is evident, under the *Carter* analysis, prongs one and three are inextricably intertwined. Thus, "evidence [that] would shake the very foundation of the State's case and almost certainly alter the earlier jury verdict" could not be categorized as "merely cumulative." *Ibid.* (internal quotation marks and citation omitted). "The power of the newly discovered evidence to alter the verdict is the

central issue, not the label to be placed on that evidence." *Id.* at 191–92, 850 *A.*2d 440 (citation omitted).

Prong two requires that "the new evidence must have been discovered after completion of trial and must not have been discoverable earlier through the exercise of reasonable diligence." *Id.* at 192, 850 *A.*2d 440 (citing *Carter, supra,* 85 *N.J.* at 314, 426 *A.*2d 501). The defense must "act with reasonable dispatch in searching for evidence before the start of the trial." *Ibid.* One important caveat must be kept in mind. "[E]vidence clearly capable of altering the outcome of a verdict that could have been discovered by reasonable diligence at the time of trial would almost certainly point to ineffective assistance of counsel." *Ibid.* (citation omitted). It hardly bears mentioning that "[w]e would not require a person who is probably innocent to languish in prison because the exculpatory evidence was discoverable and overlooked by a less than reasonably diligent attorney." *Ibid.* (citations omitted).

We now apply these principles to the record before us.

## C.

Nash was charged with sexually assaulting J.B., a special-education student, on three separate occasions. The case was a classic credibility contest between the accuser and the accused. J.B. asserted that Nash perpetrated the offenses by luring him into the school bathroom. There was no powerful corroborative evidence. The physician who examined J.B. could not opine that J.B.'s rectal fissure was consistent only with sexual abuse.

Nash testified that he did not commit the offenses. He added that J.B.'s account of the sexual assaults in the bathroom could not be true because J.B. was assigned an aide who followed him at all times. Given Nash's account, the presence of a shadow aide would have made J.B.'s recitation seemingly incredible.

The prosecutor presented in rebuttal the school's principal, Carl Gregory, who testified that J.B. had never been assigned a

personal aide. Gregory's words were the final piece of testimony heard by the jury. The principal's testimony refuted the centerpiece of Nash's defense—that he could not have committed the offense because an aide supervised J.B. Nash's credibility was seriously damaged by the school's most authoritative voice. During summation, even defense counsel retreated from Nash's testimony that J.B. was assigned an aide. Not surprisingly, Nash was convicted.

Yet, shortly after the trial, it became clear that Nash was not mistaken about the aide. Rather, it was the principal who made too fine a point by the use of the term personal aide. The principal assigned a classroom aide, Crystal St. Louis, to follow J.B. full-time without ever reclassifying her as a personal aide. According to her sworn statements and PCR testimony, St. Louis either followed J.B. or watched him walk to the bathroom door and directed that another student accompany him inside. St. Louis's assignment as J.B.'s full-time aide has been confirmed not only by St. Louis, but also by Vice Principal Torelli in her 2002 affidavit, by Principal Gregory in his 2004 certification, and by J.B.'s classroom teacher, Sharp–Conte, in her 2004 certification and PCR testimony. Moreover, the PCR court made a factual finding that St. Louis was assigned as J.B.'s aide.

The evidence that J.B. was assigned an aide was clearly material because it strongly advanced Nash's general denial of guilt and corroborated that he was telling the truth, not lying as suggested by Gregory's testimony. *See Ways, supra,* 180 *N.J.* at 188, 850 *A.*2d 440. Moreover, the evidence was not merely cumulative or impeaching as indicated by the trial court in 2002. According to the trial court, the evidence that an aide followed J.B. was of a kind "that would probably change the jury's verdict if a new trial was granted." We realize that the trial court did not have the benefit of *Ways,* decided in 2004, which refined the *Carter* test and explained that "evidence that would have the probable effect of raising a reasonable doubt ... would not be considered merely

cumulative [or] impeaching." *Id.* at 189, 850 *A*.2d 440 (citing *State v. Henries,* 306 *N.J.Super.* 512, 535, 704 *A*.2d 24 (App.Div.1997)).

The PCR court's conclusion that the uncalled witnesses would have "contributed nothing substantively new" and that the evidence of guilt was "overwhelming" is seemingly contradicted by the remarks of the trial court. It is also refuted by the Appellate Division, which held that the averments in the certifications of St. Louis, Sharp–Conte, and Gregory "if produced at an earlier time, would have served to support defendant's case." Even the prosecutor conceded that had the defense presented evidence about the aide "it probably would have been a different case." The PCR court's characterization of the evidence of guilt as "overwhelming" based on its review of the trial transcripts is not entitled to the same deference as the PCR court's findings "which are substantially influenced by [its] opportunity to hear and see the witnesses." *Elders, supra,* 192 *N.J.* at 244, 927 *A*.2d 1250 (quoting *Johnson, supra,* 42 *N.J.* at 161, 199 *A*.2d 809). That is because we are equally capable of evaluating the strength of the evidence in the trial record. We cannot conclude that the evidence of guilt was "overwhelming" in light of the newly discovered evidence.

We hold that Nash has met prongs one and three of the *Carter* test. He has established that testimony about the assignment of a full-time aide to J.B. and the close monitoring of J.B. by St. Louis was material, not merely cumulative and impeaching, and is the sort of evidence "that would probably change the jury's verdict if a new trial were granted." *Carter, supra,* 85 *N.J.* at 314, 426 *A*.2d 501 (citations omitted).

We next turn to prong two of the *Carter* test—whether the evidence concerning J.B.'s aide was "discoverable by reasonable diligence" before trial. *Ibid.* The PCR court found that defense counsel conducted a reasonable investigation. The evidentiary hearing makes clear that trial counsel's efforts were probably thwarted by Principal Gregory's gag order, which made people such as St. Louis and Sharp–Conte wary of cooperating with the defense. In the end, the PCR court determined that Nash did not

receive ineffective assistance of counsel. In other words, the failure to access the exculpatory evidence was not the fault of defense counsel. Although the PCR court was not directly addressing the *Carter* test, its findings constituted an affirmation that defense counsel performed with reasonable diligence and that the exculpatory evidence was not discoverable before trial. We defer to the findings of the PCR court in weighing witness testimony when those findings are supported by sufficient credible evidence in the record. *See Harris, supra,* 181 *N.J.* at 415, 859 *A.*2d 364 (citing *Toll Bros., supra,* 173 *N.J.* at 549, 803 *A.*2d 53); *Elders, supra,* 192 *N.J.* at 243, 927 *A.*2d 1250 (citation omitted). We do so here.

In conclusion, we hold that Nash has satisfied all three prongs of the *Carter* test. Because the evidence discovered since the first trial would probably lead to a different result if presented to a newly impaneled jury, Nash is entitled to a new trial. *See Ways, supra,* 180 *N.J.* at 197, 850 *A.*2d 440. Our ruling is not a judgment on Nash's guilt or innocence, for "that function falls within the exclusive purview of the jury after reviewing all the evidence." *Ibid.* A jury is well-suited to determine each witness's knowledge, bias, consistency, and overall credibility.

## D.

We also hold that a new trial must be conducted on all charges, including those involving K.L. Most of the trial pertained to J.B.'s accusations. Gregory's testimony conveyed the false impression that Nash had not been telling the truth about the assignment of an aide to J.B. That testimony shattered Nash's credibility, branding him as a liar. The damage done to Nash's credibility cannot be compartmentalized; it infected the whole trial, including Nash's ability to defend against the claim made by K.L. Nash's defense to K.L.'s charge depended on the jury's assessment of his general credibility. If the jury believed that Nash concocted a false defense to J.B.'s claim, it surely was not likely to credit his denial of K.L.'s charge. Indeed, the jury was

instructed that if Nash or any witness "knowingly testified falsely to any material facts" the jury—in its discretion—was entitled to disregard all of that witness's testimony.[12]

K.L. testified that on one occasion Nash improperly rubbed his shoulders and touched his buttocks. There were no witnesses and no physical evidence to support either K.L.'s charge or Nash's denial. The case was a simple credibility contest. Gregory's misleading testimony cast Nash as untrustworthy, and that alone was enough to tip the scales unfairly against Nash. *See State v. Frisby*, 174 *N.J.* 583, 596, 811 *A.*2d 414 (2002) ("This case was a pitched credibility battle.... Any improper influence on the jury that could have tipped the credibility scale was necessarily harmful and warrants reversal."); *see also Commonwealth v. Moran*, 439 *Mass.* 482, 789 *N.E.*2d 121, 127 (2003) (reversing conviction because "credibility was pivotal to the case" and the exclusion of evidence that would have impeached complainant "created a substantial risk of a miscarriage of justice.").

In the special circumstances presented in this case, we are constrained to reverse on all charges and grant Nash a new trial.

## VI.

### A.

We offer some last words on this case's ten-year odyssey through our court system. The holding of an evidentiary hearing to decide the merits of the newly discovered evidence claim should not have taken eight years. The old phrase that "justice delayed is justice denied" is certainly apt here. The State and defense both benefit when issues and claims are expeditiously resolved.

---

[12] The jury was given the "false in one–false in all" model charge. "If you believe that any witness or party willfully or knowingly testified falsely to any material facts in this case with the intent to deceive you, you may give such weight to his or her testimony as you deem it is entitled. You may believe some of it, or you may, in your discretion, disregard all of it." *See Model Jury Charge (Criminal)*, "False in One—False in All" (Mar. 25, 1991).

The challenge to the State and defense in presenting their cases more than ten years after the relevant events is substantial, perhaps herculean. Memories fade, and people move on with their lives. Witnesses available in 2002 may not be alive today. For example, Principal Gregory died during the course of the extended proceedings in this case. Victims should not have to revisit searing and traumatic events many years after they have occurred. And, significantly, if Nash is ultimately found not guilty, the years lost to him cannot be reclaimed. Therefore, our courts must ensure that meritorious newly discovered evidence claims receive timely hearings.

### B.

In sum, we agree with the Appellate Division's determination that Nash was not denied a fair trial due to ineffective assistance of counsel or prosecutorial misconduct. However, the Appellate Division upheld the PCR court's denial of post-conviction relief to Nash without ever addressing the newly discovered evidence issue. At this late date, we see no purpose in sending this matter back to the Appellate Division given our exhaustive review of the record.

For reasons already expressed, we hold that Nash is entitled to a new trial based on newly discovered evidence. We therefore reverse the judgment of the Appellate Division and remand to the trial court for proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS, PATTERSON, and Judge CUFF (temporarily assigned)—6.