**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2358-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DANTE WILSON,
a/k/a DONTA WILSON,

     Defendant-Appellant.

_____

Submitted April 28, 2021 – Decided May 21, 2021

Before Judges Geiger and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 04-12-1517.

Kelly Anderson Smith, attorney for appellant.

Gurbir S. Grewal, Attorney General, attorney for respondent (Deborah Bartolomey, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant Dante Wilson was convicted of the fatal shooting of Cage Suttle and related crimes. He appeals from an October 12, 2018 Criminal Part order denying his petition for post-conviction relief (PCR) following a six-day evidentiary hearing. We affirm.

The underlying trial evidence and procedural history are detailed in our unpublished decision affirming defendant's conviction on direct appeal. State v. Wilson, No. A-3732-10 (App. Div. Aug. 12, 2015). We incorporate both by reference. We recounted the underlying facts as follows:

> William Troy Mayes, the State's primary witness, began transporting heroin to Pittsburgh, Pennsylvania in 2002. The victim, Cage Suttle, assisted Mayes with bagging the heroin and transporting it from Elizabeth, where they both lived, to Pittsburgh, where it was resold. In the process, Mayes became familiar with a gang known as the C.R.E.A.M. Team, members of which were engaged in the sale of heroin in Pittsburgh. . . .
>
> In early April 2004, Mayes sent Suttle to Pittsburgh with a package of heroin. Because Mayes was dissatisfied with its quality, he requested that Suttle bring the heroin back to Elizabeth. Mayes intended to return the heroin to the supplier from whom he had purchased it.
>
> . . . .
>
> Shortly before midnight on April 7, Mayes was in front of his aunt's home in Elizabeth, meeting with his heroin source. The source gave him a "finger" of heroin, which consists of approximately ten grams of heroin in a glove. As Mayes was talking with his

source, a silver Ford Explorer SUV with Pennsylvania license plates pulled up and double parked in front of the house.  Suttle was in the passenger's seat of the Explorer.

Mayes went over to the Explorer and stood on the driver's side.  He testified that the street light was near the car and it was "[r]eally lit up out there."  According to Mayes, he looked into the Explorer to see who Suttle had with him . . . .

The driver of the Explorer was later identified as Eurie Nunley, a drug dealer from Pittsburgh.  A man, subsequently identified as Wilson, was sitting in the back seat.  Mayes recognized Nunley and Wilson, both of whom he had seen in the past with a friend who was affiliated with the C.R.E.A.M. Team in Pittsburgh, but he did not know their names.  . . .

Mayes told Nunley to come inside his aunt's house, so he could show him some new heroin.  Nunley, Suttle, and Mayes went inside the house to talk.  Shortly thereafter, however, Suttle left and went outside.  Nunley and Mayes remained inside.  Mayes showed Nunley the finger of heroin, and told him that he would bring heroin from that batch to Pittsburgh later.

While Mayes was showing Nunley the heroin, he heard three or four shots from outside the house.  As Mayes and Nunley were going downstairs to see what had happened, Nunley expressed concern that Mayes might be setting him up.

Once outside, Mayes saw the Explorer with its passenger door and glove compartment open.  Money was scattered on the floor and around the car.  Mayes then saw Wilson running towards him and holding a gun pointed at him.  After Nunley yelled "nah, nah" to

3

Wilson, he and Wilson got inside the Explorer and drove away. . . .

A.E., a neighbor who lived across the street, witnessed the shooting from a window in his apartment. He testified that he heard four "continuous" gunshots from "under [his] window." After A.E. heard the first shot, he "ran" to the window and saw "a guy chasing another guy on the sidewalk running after him with a gun in his hand." He witnessed one of the men shoot the other.

A.E. described the two men as black males. He could not see their faces, but testified that they were about the "same size, medium build." According to A.E., one of the men had hair with "stripes." He did not know the proper name for the hairstyle.

After the last shot was fired, A.E. saw the shooter go on "top of the victim and kind of twist him to the side" and go through his pockets and take money. A.E. then heard the shooter yell towards men[1] who had come out of the adjacent house, "Let's go, let's go, let's get out of here."

The shooter got into the passenger's seat of the Explorer, while one of the men who had just come out of the house got into the driver's seat. The Explorer backed into the car behind it, then pulled away. A.E. saw another man go back inside the house. The third man got into another vehicle parked on the street and drove away.

A.E. called 9–1–1 to report the shooting. Fifteen minutes later, he saw a Pontiac sedan pull up. A man came out of the house and got into the car, which then drove away. According to Mayes, after the shooting, he had called C.H. and asked him to pick him up at his aunt's house. C.H. confirmed that he

4                                                                A-2358-18

had, and also testified that he had driven Suttle to Walnut Street in Elizabeth earlier that evening. . . .

Mayes was subsequently arrested and questioned by the police. After viewing a photo array, he identified the driver of the Explorer as Nunley. Following a second photo array, Mayes identified Wilson as the shooter. With the assistance of the police in Pennsylvania, the Elizabeth police arranged for a lineup in Pittsburgh. Mayes identified Wilson from a group of six men. Mayes testified that he had no doubt about his choice.

[Id. at 1-2.]

A Union County grand jury returned an indictment charging defendant with first-degree murder of Suttle, N.J.S.A. 2C:11-3(a)(1), (2) (count one); second-degree conspiracy to possess a controlled dangerous substance (CDS) with intent to distribute, N.J.S.A. 2C:5-2 and 2C:35-5(a)(1) (count two); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-5(b) (count three); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count four); and second-degree possession of a weapon while committing a CDS offense, N.J.S.A. 2C:39-4.1(a) (count five).

At one point, jail authorities seized defendant's mail, which became the subject of a pretrial suppression hearing. The trial court ultimately denied the motion, finding the seizure was authorized by N.J.A.C. 10A:31-19.5, because there was reliable information sufficient to raise legitimate concerns about witness tampering and possible threats against Mayes, and defendant had not

A-2358-18

established that the search was pretextual or based on anything other than reliable information of potential illegal activity.

Following a three-week trial, the jury found defendant guilty of the lesser included offense of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1) on count one, and the remaining four counts. We affirmed defendant's conviction on direct appeal and the Supreme Court denied certification. State v. Wilson, 224 N.J. 244 (2016).

Defendant filed a pro se petition for PCR. The court dismissed it without prejudice because his petition for certification was still pending. In March 2016, defendant refiled his petition. Counsel was assigned to represent him and submitted a supplemental petition along with certifications of family members and his own certification in support of his alibi claim.

Defendant asserted that Lucy Cruz was interviewed by police shortly after the shooting. She indicated that she heard three shots. When she looked out of her door, she saw the victim leaning on the white Honda with a Hispanic male with long black hair, wearing a white shirt and blue jeans with a black handgun in his right hand, standing next to him. She claimed that the Hispanic male took something from the victim and ran east on Marshall Street. Defendant notes that trial counsel did not interview Cruz or call her as a witness despite subpoenaing her and her presence in the courthouse.

However, Cruz became ill and unavailable before the trial began. An investigator for the Office of the Public Defender certified that Cruz "suffers from multiple illnesses, such as anxiety, depression, heart problems and nerve deficiency[,]" "did not want to talk to" the investigators, and "[i]t became abundantly clear to [him] that Lucy Cruz was no longer available as a witness for this case."

Defendant further asserted that during its investigation, law enforcement learned that the victim was engaged to Clara McNeil, who gave a statement to police, which was provided in discovery to trial counsel. McNeil indicated that Suttle, Mayes, Charles Hawley, Nunley, and another individual were all in her presence at various times on the night of the shooting. McNeil stated that the men were together at 8:00 p.m., 8:30 p.m., and 11:30 p.m. that night. McNeil did not identify defendant as being present on the night of the shooting. Trial counsel did not use McNeil's statement at trial and did not subpoena her as a witness. Defendant claims the statement could have been used to undermine the credibility of Mayes and Hawley.

On January 11, 2018, the PCR judge determined defendant established a prima facie case of ineffective assistance of counsel and granted an evidentiary hearing to determine: (1) notice of the codefendant's willingness to provide exculpatory testimony; (2) the investigation of Tiffani Walker as a witness;

A-2358-18

and (3) the investigation of alibi witnesses Kendren Broadus, Tyrell Ferguson, Tamika Ferguson, Aushakee Ferguson, Pernell Ferguson, Michael Jefferson, and Angel Diggs.

Defendant, Aushakee,[1] Tyrell, Tamika, Pernell, and trial counsel testified at the evidentiary hearing. Defendant withdrew his claims concerning Nunley and Walker because they refused to testify. Jefferson did not testify at the hearing because he had passed away.

Aushakee is defendant's second cousin and the daughter of Tamika. At the time of the hearing, she was twenty-seven years old. Aushakee testified she was thirteen years old and lived in Pittsburg in 2004. She visited defendant's mother's home on April 8, 2004. Defendant gave her a t-shirt as a birthday present that day. Aushakee later saw defendant at her birthday party on April 9, 2004. Her testimony was partially contradicted by a July 25, 2019 certification she signed that averred that her birthday party was held on April 8, 2004. Aushakee further testified that she did not attend defendant's trial, did not know the name of defendant's trial counsel, and was not contacted by counsel or a Public Defender investigator.

---

[1] We refer to several of the witnesses by their first name because they share a common surname. We intend no disrespect.

The PCR judge determined Aushakee "promoted inaccurate testimony before [the] [c]ourt in a misguided effort to assist her cousin based upon their familial relationship." He found Aushakee's testimony was not credible, observing: "Her testimony contained many internal inconsistencies and was contrived. If she is to be believed, her memory of events has improved with time, contrary to human experience."

Tyrell, defendant's cousin, testified that when he was between fourteen and eighteen years old, he lived with defendant's mother and was close with defendant during that period. Around 7:00 p.m. on April 7, 2004, Tyrell returned to defendant's mother's home from a youth detention program. Around 8:00 p.m., defendant, his girlfriend, defendant's best friend Kendren Broadus, and Broadus' girlfriend arrived. Defendant spent the night there. Tyrell saw him the following morning with Broadus and his girlfriend.

Tyrell further testified that when he came home from school on April 8, 2004, defendant, Broadus, and others were there. The atmosphere was tense because there were suspicions that Pernell stole money from Broadus' girlfriend's purse. Tyrell did not attend Aushakee's birthday party that day because it would have violated his curfew but claimed defendant attended it.

Tyrell did not reach out to defendant's trial attorney, and neither the attorney nor investigators reached out to him. He was later contacted by

9

defendant's PCR counsel and signed a certification that stated the day before his arrest defendant was in a fight with Pernell.

The PCR judge found Tyrell's testimony was incredible, "[d]efying common sense and human experience." He found Tyrell's mannerisms and tonal inflections had "the appearance of unreliability." Furthermore, his testimony contradicted his prior "certification in material respects."

Tamika is defendant's first cousin and Aushakee's mother. She testified that in 2004, she lived in Pittsburgh with her four children and was employed as a corrections officer. She and defendant had a close relationship; defendant visited her home three to four times a week and often babysat her children.

Tamika testified that the day before her eldest child Aushakee's thirteenth birthday, she went to defendant's home early in the morning with Aushakee before work to pick up the gift. She remembered Aushakee being excited about her new t-shirt.

Tamika was not contacted by the Public Defender's office, its investigator, or defendant's trial counsel. On August 22, 2017, she signed a certification that she could not remember what kind of t-shirt defendant gave Aushakee.

The PCR judge rejected Tamika's testimony, stating it "defies common sense." He found her body language and voice intonation made her a "wholly

A-2358-18

incredible witness" and her certification contradicted her testimony. The judge further noted "the substantive portions of her testimony were developed through leading questions to the point where the [c]ourt had to ask for non-leading questions."

Pernell is defendant's first cousin. He testified that around seven or eight p.m. on April 7, 2004, he and his younger brother visited defendant at his home in Pittsburgh. Pernell was in high school and already had a criminal record. Both stayed with defendant on April 7 and 8, 2004. Tyrell and several of defendant's friends were also there.

The judge found Pernell's testimony "belied common-sense and appeared to be scripted as he had specific recollection of the defense's key points, and poor recollection of anything else." Pernell's "substantial criminal history" and "untruthful" demeanor "negatively impact[ed] his credibility." The judge deemed Pernell an incredible witness and rejected his testimony.

Defendant testified that in January 2008, after spending two and one-half years in prison in Pennsylvania, he was extradited to New Jersey and met trial counsel one month later. He told trial counsel he had never been to Union County and clearly remembered his whereabouts on April 8, 2004, because of Aushakee's party. Defendant said he spent the weekend at his mother's house and told trial counsel that Tamika, Aushakee, Tyrell, Pernell, and four others

A-2358-18

could place him there on that day. He was under the impression trial counsel would contact his alibi witnesses, with his mother acting as the contact person.

Defendant further alleged trial counsel only contacted him about five times over the course of over two years. He claimed trial counsel failed to answer letters but did "speak" with his girlfriend, Angel Diggs. He asked trial counsel to speak to Aushakee, Broadus, and Jefferson, which he failed to do.

On cross-examination, defendant admitted he was highly involved in the case and had prepared extensively for trial. He acknowledged he never contacted family members about becoming alibi witnesses, contending it was trial counsel's job to do so. When he wrote to family members, he refrained from talking about the details of the case on the advice of counsel.

In January 2010, defendant wrote to trial counsel informing him that Aushakee did not recall meeting with him prior to her birthday. He further advised that although Aushakee remembered her gift, she did not remember the conversations with defendant regarding her birthday. The letter also named two additional alibi witnesses, Terry Adams and Antonin Smith, but goes on to say that Adams was shot and killed in January 2007, and Smith died of cancer in mid-2008.

In February 2010, defendant again wrote to trial counsel advising that he no longer would be using Diggs as an alibi witness. Defendant testified that

A-2358-18

his decision resulted from trial counsel telling him that Diggs would not support him. However, in a conversation with trial counsel, defendant acknowledged that Diggs "sounds a little bit confused and mixed up."

As noted by the judge, "Diggs was actually called at trial by the State due to [d]efendant allegedly attempting to influence her memory and testimony." Defendant "attempt[ed] to feed information to Ms. Diggs concerning his alibi." The court found that Diggs' testimony at trial "did not comport with the alibi being advanced by [d]efendant."

Trial counsel testified that at the time of the PCR hearing, he had been an assistant deputy public defender for almost twenty years and had handled thousands of cases and "well over" 100 trials. He described defendant as well-read, informed, intelligent, and actively involved in the defense of his case. Defendant and he had frequently discussed trial strategy.

Trial counsel further testified that he investigated defendant's alibi, but it "wasn't working out." He spoke to defendant's mother and sent her a January 6, 2010 letter regarding defendant's alibi. She was elderly and had problems with memory. Trial counsel's file contained a note that during his two or three conversations with defendant's mother, she said she would supply alibi names but never did so. In a March 31, 2010 letter, defendant asked trial counsel to remove his mother from the witness list.

13

Trial counsel also testified that he investigated other alibi witnesses and found that they did not recall the events described by defendant. He removed Diggs as a potential witness because she was unable to provide sufficient information due to memory issues, and her recollection of events did not match defendant's. He considered Aushakee but decided she was too young to act as an alibi witness.

Trial counsel thought the alibi defense was a "bad idea." A December 10, 2008 note in his file indicated defendant was unwilling to provide an alibi because his mother and niece had him at different locations. He believed the main alibi witnesses were "taking a dive" and "leading down [a] street that [he did not] want to go down at that point . . . because there is a question as to whether the alibi is legitimate or not." He reasoned that defendant's mother's and girlfriend's "serious memory problems" was a "bad sign" that "cast[] a bad shadow on the story."

Trial counsel testified that the agreed upon strategy was to attack the credibility of Mayes, who was the State's key eyewitness to the homicide. Trial counsel investigated Mayes' criminal history, concluding he was a career drug dealer who would sell out anyone to improve his own position. Defendant reviewed the discovery with counsel and pointed out inconsistencies in Mayes' statements.

A-2358-18

The judge found that trial counsel "presented as an entirely credible witness" and "as a zealous advocate whose practice was to work closely with his client and advise his client based upon the facts of the case and his experience." Trial counsel was "unwavering in his position that [d]efendant consented to the defense presented and that an alibi defense would have been presented if [d]efendant demanded same." His testimony established that four of the key alibi witnesses, including defendant's mother, girlfriend, and close cousin, would not support an alibi. Additionally, that the letters defendant wrote to trial counsel "support[ed] [trial counsel's] recollection that the alibi defense was not the defense that was going to be advanced at trial."

The PCR judge issued a comprehensive written decision that included extensive credibility findings and concluded "there was an appropriate informed consultation between [d]efendant and [trial counsel] on the issue of alibi" and that "[a]fter this consultation, [d]efendant agreed not to pursue an alibi at trial." Additionally, defendant's "position [was] one of convenience rather than merit," which he "rejected as incredible." The judge found no extrinsic evidence supported the alibi defense, which "was a poorly concocted sham that would not have been believed by a rational juror."

Furthermore, there was no lack of investigation, as trial counsel's investigation "was sufficient to establish that the alibi was not viable." As to

15                                                                    A-2358-18

the potential alibi witnesses that trial counsel was unable to contact, the court considered those witnesses to be "ancillary to the defense as the testimony of [d]efendant's mother, girlfriend, and Aushakee would undermine their version of the alibi at trial – as was the case with the actual testimony of Angel Diggs."

Based on these findings, the judge concluded trial counsel's performance did not fall below applicable standards and denied defendant's petition. This appeal followed.

We granted defendant's motion to be represented by substituted counsel and to submit supplemental briefing. In his initial brief, defendant argues:

> BECAUSE DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL, THE PCR COURT ERRED IN DENYING DEFENDANT'S PETITION FOR PCR.
>
> A. Legal Standards Governing Applications for Post-Conviction Relief.
>
> B. Trial Counsel was ineffective When He Failed to Properly Prepare for this Case Pre-trial by Failing to Investigate the Case and Failing to Prepare and Litigate this Case During Trial and Through to Sentencing.[2]

In his supplemental brief, defendant raises the following additional points:

---

[2] Defendant did not argue his sentence was illegal or excessive on direct appeal. In this appeal, he did not brief any alleged ineffective assistance of counsel relating to sentencing. According, we deem this claim waived. See Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011) ("An issue not briefed on appeal is deemed waived.").

POINT I

THE PCR COURT IMPROPERLY ASSESSED AND DISMISSED THE TESTIMONIES OF DEFENDANT'S ALIBI WITNESSES AS WELL AS IMPROPERLY DENIED DEFENDANT'S PCR MOTION.

POINT II

THE TRIAL COURT DENIED DEFENDANT DUE PROCESS BY FAILING TO PROPERLY CONDUCT AN EVIDENTIARY HEARING AS TO ALL OF DEFENDANT'S ISSUES RAISED IN HIS PCR PETITION AND BRIEF.

>A. The Trial Court Abused Its Discretion in Denying Defendant an Evidentiary Hearing as it Related to Lucy Cruz.
>
>B. PCR Court Should Have Granted an Evidentiary Hearing as it Related to Clara McNeil.

Defendant's petition for PCR is premised upon his right to effective assistance of counsel in his criminal trial. He argues trial counsel was ineffective "because his viable alibi defense was not presented at trial due to the conduct of his attorney which fell below an objective standard of reasonableness."

"In reviewing a PCR court's factual findings based on live testimony, an appellate court applies a deferential standard; it 'will uphold the PCR court's findings that are supported by sufficient credible evidence in the record.'"

State v. Pierre, 223 N.J. 560, 576 (2015) (quoting State v. Nash, 212 N.J. 518, 540 (2013)). In particular, a reviewing court will grant deference to the PCR judge's firsthand assessment of witness credibility. Ibid. "However, a 'PCR court's interpretation of the law' is afforded no deference, and is 'reviewed de novo.'" Ibid. (quoting Nash, 212 N.J. at 540-41).

In Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court established a two-pronged test for determining whether defendant was afforded effective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
>
> [Id. at 687.]

The Strickland standard has been adopted for evaluating ineffective assistance of counsel claims under Article 1, Paragraph 10 of the New Jersey Constitution. State v. Fritz, 105 N.J. 42, 58 (1987).

"Judicial scrutiny of counsel's performance must be highly deferential." Strickland, 466 U.S. at 689. "An attorney is entitled to 'a strong presumption' that he or she provided reasonably effective assistance, and a 'defendant must

18

overcome the presumption that' the attorney's decisions followed a sound strategic approach to the case." Pierre, 223 N.J. at 578-79 (quoting Strickland, 466 U.S. at 689).

Generally, trial counsel should interview all alibi witnesses. Id. at 582. However, "[d]etermining which witnesses to call to the stand is one of the most difficult strategic decisions that any trial attorney must confront." State v. Arthur, 184 N.J. 307, 320 (2005). Trial counsel must consider the testimony a witness is expected to give, whether the witness's testimony can be effectively impeached, whether the witness is likely to contradict the testimony of other defense witnesses, whether the jury is likely to find the witness credible, and other factors. Id. at 320-21 (citation omitted).

Our role in reviewing a decision not to call an alibi witness "is to fairly assess" that decision "in the context of the State's case against defendant and the strengths and weaknesses of the evidence available to the defense." Pierre, 223 N.J. at 579. When undertaking that assessment, we defer to the PCR court's factual findings, including its findings as to the credibility of trial counsel's testimony at the PCR hearing regarding trial strategy. Ibid.

Defendant must establish his right to PCR "by a preponderance of the credible evidence." Nash, 212 N.J. at 541 (quoting State v. Preciose, 129 N.J. 451, 459 (1992)). Our review of a PCR court's factual findings following an

evidentiary hearing is deferential; "we will uphold the PCR court's findings that are supported by sufficient credible evidence in the record." Id. at 540.

Applying these legal principles to the facts of this case, we affirm substantially for the reasons expressed by Judge John M. Deitch in his cogent written decision. We add the following comments.

The judge heard extensive testimony. His factual findings and credibility determinations are amply supported by the credible evidence in the record. His conclusions of law are consonant with applicable precedent.

Defendant argues that the credibility issues discussed by the judge are irrelevant under a Pierre analysis. We disagree. The credibility of the defendant, the potential alibi witnesses, and trial counsel was essential to analyzing both prongs of the Strickland/Fritz test. It directly affected the strength or weakness of the alibi, whether trial counsel adequately investigated the defense, whether defendant agreed not to proceed with that defense, and whether the decision to not present an alibi defense prejudiced him.

Defendant also argues that the judge erred by not permitting Cruz and McNeil to testify during the evidentiary hearing. We disagree.

Cruz became ill and unavailable to testify, suffered from multiple illnesses and psychiatric conditions, and was uncooperative. Defendant claims counsel should have taken a sworn statement from her but did not offer any

20

basis for the admissibility of the statement. Judge Deitch found that this amounted to mere "piece[d-]together testimony to create a third[-]party guilt defense based on Ms. Cruz['s] assertion that the man she saw standing next to the victim was a Hispanic male." Notably, although defendant contends Cruz was an eyewitness who identified the shooter, she told police that she did not look outside until after the shots were fired. The judge found the "decision not to call Lucy Cruz, or obtain a statement from her, [did] not rise to the level of ineffective assistance of counsel."

As to McNeil, defendant instructed trial counsel not to use his mother, girlfriend, and cousin Aushakee as alibi witnesses. Rather than proceeding with an alibi that was not panning out, trial counsel and defendant agreed that the better strategy was to attack the credibility of the State's primary witness, an admitted large-scale heroin dealer.

While defendant claims her testimony would have "tied up" points made in trial counsel's closing argument, the judge found "[t]his vague assertion [was] not a basis for a claim of ineffectiveness of counsel." Additionally, her statement was not admissible and the decision not to call Ms. McNeil was a strategic decision as her testimony might easily have undermined his defense.

We review trial counsel's strategic decisions for reasonableness "applying a heavy measure of deference to counsel's judgment[]." Strickland,

466 U.S. at 691. Viewed through that lens, trial counsel's strategy was reasonable under the circumstances. We also discern no abuse of discretion in not allowing McNeil and Cruz as witnesses during the evidentiary hearing.

In sum, defendant did not satisfy either prong of the Strickland/Fritz test. His petition was properly denied.

Defendant's remaining arguments lack sufficient merit to warrant further discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

22                                                          A-2358-18