**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3217-22

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

DENARIUS X. HARRIS, a/k/a
DENARIUS HARRIS, DENZRIUS
HARRIS, DENARUS X. HARRIS,
and COODA BLU COODA,

    Defendant-Respondent.

_____

Argued April 8, 2024 – Decided May 6, 2024

Before Judges Gilson and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 16-06-1580.

Natalie A. Schmid Drummond, Assistant Prosecutor, argued the cause for appellant (Grace C. MacAulay, Camden County Prosecutor, attorney; Natalie A. Schmid Drummond, of counsel and on the brief).

Peter Thomas Blum, Assistant Deputy Public Defender, argued the cause for respondent (Jennifer Nicole

Sellitti, Public Defender, attorney; Peter Thomas Blum,
of counsel and on the brief).

PER CURIAM

The State of New Jersey appeals a June 20, 2023 order of the Law Division granting defendant Denarius Harris's petition for post-conviction relief (PCR) following an evidentiary hearing. After granting the PCR, the trial judge vacated defendant's conviction for armed robbery. Based on our review of the record and applicable principles of law, we affirm Judge Kurt Kramer's well-reasoned decision because his findings of fact are supported by substantial credible evidence and he correctly applied the law.

I.

We derive the procedural history and facts from the record. In the late evening of January 25, 2016, two armed men knocked at the door of an apartment located in the Borough of Magnolia, Camden County. After checking the peephole and seeing nothing, the owner, William Wilson, IV, opened the door. Both men entered with guns drawn. William later described one of the intruders as African American, about six feet, four inches tall, wearing a hat, gloves, and a ski mask fully covering his face. He described the other as Latino, olive-skinned, significantly shorter, also wearing a mask.

The taller of the two men put a gun to William's chest. William pushed it aside. Both attackers then spun William around and laid him on a nearby couch. They searched him, took his keys and wallet, and demanded to know the whereabouts of a person named "Ronnell." Leaving William in place to find Ronnell, the intruders headed toward an adjacent room where they were confronted by Sara Wilson, William's daughter. After encountering other family members, the men found Sara's boyfriend, Ronnell Wilson.[1] At the robbers' direction, Sara retrieved from a safe and surrendered Ronnell's gold chain and Michael Kors watch, among other valuables. The robbers then left the premises, returning William's keys on their way out.

Despite the robbers' masks, Ronnell believed he recognized the taller of the two as an associate of his friend "C Mack." Sara thought she could identify the same perpetrator, as she was able to see his eyes and the bridge of his nose. Ronnell was a Facebook friend of C Mack and shared with Sara access to his webpage. Sara looked through C Mack's Facebook friends, spotting a person she thought matched the taller culprit. That person's nickname was "Kuda Blue," later identified as Denarius Harris.

---

[1] Though not blood-related to the Wilson family, Ronnell shares their surname. For ease and clarity, we refer to the parties by their first names. By doing so, we intend no disrespect.

A-3217-22

Sara produced a photo of defendant from the website and presented it to a detective from the Camden County Prosecutor's Office. Approximately one month later, on February 17, another detective assembled a photo array that included a photograph of defendant. When presented with the array, Ronnell stated he was in fear for his life and did not make an identification. Neither William, nor his son, William Wilson, VI, also there that evening, was able to make an identification from the array. However, Sara identified defendant's photo with eighty percent certainty it depicted the offender. Based on her positive identification, detectives applied for and executed a warrant at defendant's home in Sicklerville. From their search, police recovered a gold chain and watch, later recognized by Ronnell and Sara as belonging to Ronnell. Police also recovered a black BB gun resembling an automatic weapon identified by William, Sara, and Ronnell as used in the robbery.

Defendant was arrested and indicted in March 2016 for multiple counts of first-degree robbery, N.J.S.A. 2C:15-1(a)(1) to (2) (counts one through four); second-degree burglary, N.J.S.A. 2C:18-2(a)(1) (count five); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count six); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count seven); fourth-degree aggravated assault, N.J.S.A. 2C:12-1(b)(4) (counts

4

eight through eleven); second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2and N.J.S.A. 2C:15-1(a)(1) to (2) (count twelve); and second-degree conspiracy to commit burglary, N.J.S.A. 2C:5-2, N.J.S.A. 2C:18-2(a)(1), and N.J.S.A. 2C:18-2(b)(2) (count thirteen). The second perpetrator was never identified or arrested.

Trial began in March 2017. In open court, all three victims identified the defendant as one of the robbers. Even before the third victim, Ronnell, testified, defendant told trial counsel he wished to plead guilty, and counsel so informed the court. Defendant's decision to plead guilty was purportedly prompted when defendant asked whether his family members would be called to testify as alibi witnesses. In response, counsel advised defendant that the alibi witnesses he supplied were neither interviewed nor to be called to testify. With this news, after the completion of Ronnell's testimony, defendant entered a guilty plea to a single count of armed robbery pursuant to terms of a plea bargain. In the plea agreement, defendant waived objection to a discretionary extended term, permitting the State to recommend a prison term of up to twenty-two years, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, with all remaining counts to be dismissed, and imposition of mandatory fines and penalties. After assenting to the accuracy of these terms on the record, the court

posed a series of leading questions, to which defendant responded, "yes" or "no."
The court accepted defendant's guilty plea.

In May 2017, the court sentenced defendant to a prison term of twenty-two years subject to NERA. At sentencing, defendant made an oral request to withdraw his guilty plea. The trial court denied defendant's application. This court heard an appeal on the excessive sentence oral argument calendar in 2017. By stipulation of counsel, it was agreed that the matter would be remanded to permit defendant to formally move to withdraw his guilty plea.

In February 2019, with new counsel, defendant moved to withdraw his guilty plea. Applying the "manifest injustice" post-sentencing standard, the court denied the application, reasoning in an oral ruling that the Slater factors weighed against vacatur of defendant's guilty plea. State v. Slater, 198 N.J. 145 (2009); R. 3:22-1.

Thereafter, defendant filed a PCR petition. In June 2022, Judge Kramer heard argument. First, he determined that counsel was ineffective for arguing a post-hearing "manifest injustice" standard rather than the presentence "interest of justice" standard, as defendant made his initial request to withdraw his plea before sentence was imposed. Second, the judge determined that a prima facie

6

case for ineffective assistance of counsel existed and scheduled an evidentiary hearing.

After sequestering witnesses, the judge heard testimony from defendant's mother, Dr. Cheryl Harris, his aunt, Lorna Jackson-Whaley, a family friend, Marion Alison Still and defendant. To varying degrees of consistency, all witnesses testified that defendant was at his home at the time of the crime.

Specifically, defendant's mother testified that living with her in a ranch-style home in Sicklerville on the day in question were defendant, his minor child, her sister Jackson-Whaley, her sister's three minor children, and her mother. She also testified that January 25, 2016, was particularly memorable because that evening she learned her friend Still's son, Arlyn, who had been missing for some two to three years, had just returned home.

Dr. Harris recalled that defendant arrived home at approximately 8:00 p.m., that evening and remained there the entire night. Defendant came into her room between 10:00 to 10:15 p.m., that evening, and Dr. Harris told him about Arlyn's return. Defendant remained with his mother "chit-chatting" until leaving for his own room, from where his mother heard him talking on the phone with his girlfriend. At around 11:30 p.m., Dr. Harris checked on her son and found him lying on his bed. She asked if his three-year old son, her grandchild, was

home, to which he responded, "No." After midnight, she again went into defendant's bedroom and saw defendant in bed with his son, the child's mother having dropped him off. With that knowledge, Dr. Harris went to bed.

Dr. Harris testified that at their first meeting, a status conference in July 2016, she informed her son's attorney of defendant's whereabouts on the evening in question. She handed her a signed statement to this effect. Upon receiving the statement, the attorney told Dr. Harris, "You're something else." Dr. Harris and defendant's counsel never spoke again about an alibi, nor in the interim did an investigator from counsel's office ever follow up with Dr. Harris. At trial, when the State was about to rest its case, Dr. Harris approached defendant's counsel and asked whether she would be called to testify. Counsel responded that she would not be called to testify as she was "family."

The family friend, Still, testified that January 25, 2016, was a "joyous" day because of her son's unexpected homecoming. Her testimony was consistent with the testimony of Dr. Harris with respect to the time she called to relay the news. She recounted overhearing defendant's voice in the background, as the families' close ties made defendant's voice easily recognizable. Still testified that no attorney or investigator ever contacted her about the prospect of providing alibi testimony.

A-3217-22

Defendant's maternal aunt, Jackson-Whaley, testified that she was home on the night of the incident. That evening, she came home early, took a shower, and was in the family room from approximately 6:00 p.m., until she went to bed sometime after 3:00 a.m. Early in the evening, she heard defendant on the phone arguing with his girlfriend. To break the tension, she recalled sending defendant a text message containing a humorous meme. When defendant did not respond, she went into his bedroom, where she saw him lying across the bed, still on the phone. Jackson-Whaley returned to the family room and remained there the rest of the night. She testified that anyone leaving the home would have to pass through the family room to exit the home. At no point during the evening or night did she see defendant pass through the family room to leave or return. She further testified that she heard defendant in his bedroom throughout the night.

Jackson-Whaley attested to speaking with an assistant at counsel's office and mailing a printed copy of the text message to her. She did not speak directly to counsel, nor was she ever contacted by an investigator from counsel's office.

Defendant also testified, maintaining he was home the entire evening, waiting for his three-year old son to be dropped off. Consistent with the other witnesses' testimony, he testified to entering his mother's room while she was on the phone with Still speaking about Arlyn's return, then went to his own

9

bedroom to speak with his girlfriend. He also testified about his aunt Jackson-Whaley entering his bedroom to inquire why he had not responded to her text. Unlike the other witnesses, defendant testified to stepping out briefly to collect his son from the child's mother later in the evening.

Concerning trial counsel, defendant said he believed all along that his counsel was going to prepare his alibi witnesses. It was not until the second day of trial, when the judge informed the jury about scheduling and the imminence of closing arguments, that he learned his witnesses would not be called. With this newfound awareness, defendant decided to plead guilty.

Trial counsel, testified for the State. She related that although she was aware of the alibi witnesses, she thought the period of time they could attest to was too early in the evening to constitute a sound alibi. Beyond this, she was asked on direct examination whether she had "concerns about alibi witnesses [generally]." She responded, "I do. And I just don't like alibi witnesses that are family members, specifically, because they just don't tend to—it doesn't tend to help, from what I've seen." She went on to say they "typically" get "destroyed on cross examination." Later, as the judge highlighted in his decision, counsel conceded in cross-examination, ". . . maybe we should have investigated and talked to [the alibi witnesses]." She agreed also that a reasonable investigator

should have spoken to potential witnesses, which did not occur here. Beyond these concerns, counsel testified that she and defendant focused on the testimony of the State's witnesses and the real possibility that they would not appear for trial. For this reason, in effect, she conveyed it was jointly agreed not to pursue an alibi defense. Indeed, counsel never filed a notice of alibi.

In an oral decision rendered in June 2023, Judge Kramer granted defendant's petition for PCR, finding the three alibi witnesses and defendant's testimony to be credible. While acknowledging inconsistencies, he found them to be minor. The judge also found defendant's counsel's testimony to be credible, except for the decision to not call alibi witnesses. On this point, Judge Kramer found defendant to be more credible than counsel, reasoning that defendant's rejection of an otherwise generous offer of ten years was explained by his belief that with alibi witnesses' testimony, he would be found not guilty.

Citing the seminal case of Strickland v. Washington, 466 U.S. 668 (1986), among others, the court also concluded that defense counsel's failure to interview or properly investigate alibi witnesses constituted ineffective assistance of counsel. In so finding, Judge Kramer stressed he was not finding that had the alibi witnesses' testimony been presented, defendant would have been acquitted. Instead, the court found that had the alibi witnesses testified,

11

there was "a reasonable possibility a reasonable jury would have . . . reached a different verdict[,] if the matter had been tried to verdict." The court also stated that defense counsel's "failure to investigate, prepare and appropriate[ly] advise . . . defendant was conduct sufficient to—engender a reasonable probability that the result of the proceeding would have been different[,] sufficient to undermine the confidence in the outcome of the case." In closing, Judge Kramer made the following findings of fact and conclusions of law:

> [The] court previously denied defendant's other request for relief and granted the request for leave to file a motion to withdraw his guilty plea under the lesser interest of justice standard. Defendant's sentence will be vacated. Defendant will be permitted to refile the motion to withdraw his guilty plea.
>
> Specifically, the [c]ourt finds as follows. Defense counsel's failure to interview and properly investigate the defense alibi witnesses was a breach of defendant's—of defense counsel's professional standard of care and that such breach of the professional standard of care had a material impact on defendant's ultimate decision during trial to accept the plea agreement.

With the judge's decision, defendant's guilty plea to first-degree armed robbery and sentence of twenty-two years subject to NERA were rendered void. Nonetheless, the court stopped short of vacating the plea absent a formal motion.

II.

12

On appeal, the State raises a single point for our consideration:

POINT I

> THE PCR COURT ERRED BY GRANTING DEFENDANT'S PETITION FOR POST-CONVICTION RELIEF[,] BECAUSE HE FAILED TO SHOW THAT HIS COUNSEL WAS [DEFICIENT] OR THAT HE WAS PREJUDICED AS TO HIS PROPOSED ALIBI WITNESSES.

In considering this argument, we use a deferential standard of review deferring "to the PCR court's factual findings, given its opportunity to hear live witness testimony, and '. . . uphold the PCR court's findings that are supported by sufficient credible evidence in the record.'" State v. Gideon, 244 N.J. 538, 551 (2021) (quoting State v. Nash, 212 N.J. 518, 546 (2013)).

"Ineffective-assistance-of-counsel claims are particularly suited for post-conviction review because they often cannot reasonably be raised in a prior proceeding." State v. Hess, 207 N.J. 123, 145 (2011) (quoting State v. Preciose, 129 N.J. 451, 460 (1992)). In addressing an ineffective assistance claim, New Jersey courts follow the standard formulated by the United States Supreme Court in Strickland, 466 U.S. at 687. State v. Konecny, 250 N.J. 321, 342 (2022). "First, the defendant must show that counsel's performance was deficient." Gideon, 244 N.J. at 550 (quoting Strickland, 466 U.S. at 687).

13

Second, there must be a showing that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" State v. Alvarez, 473 N.J. Super. 448, 455 (App. Div. 2022) (quoting Strickland, 466 U.S. at 694).

"The defendant's conviction must be reversed if both prongs of the Strickland standard have been satisfied because, in such cases, 'the ineffective representation constitutes a breakdown in the adversary process that renders the result unreliable.'" Gideon, 244 N.J. at 550 (quoting Nash, 212 N.J. at 542 (quoting Strickland, 466 U.S. at 687)).

Our jurisprudence has long recognized that "ineffective assistance of counsel may occur when counsel fails to conduct an adequate pre-trial investigation." Preciose, 129 N.J. at 464; State v. Savage, 120 N.J. 594, 621-22 (1990); State v. Petrozelli, 351 N.J. Super. 14, 23 (App. Div. 2002). In that context, the New Jersey Supreme Court has endorsed the benchmark that "an attorney representing a criminal defendant should, as a general rule, interview all alibi witnesses" and that failure to do so satisfies the first prong under Strickland. State v. Pierre, 223 N.J. 560, 582-83 (2015). Indeed, "few defenses have greater potential for creating reasonable doubt as to a defendant's guilt in

14

the minds of the jury [than an alibi]." State v. Mitchell, 149 N.J. Super. 259, 262 (App. Div. 1977).

Having carefully reviewed the record and extending deference to Judge Kramer's credibility findings, we discern no basis for rejecting the finding that by declining to interview or investigate three potential alibi witnesses, found to be credible, trial counsel's performance was deficient, falling below an objective standard of reasonableness as defined by the first prong under Strickland.

We discern no grounds for rejecting the finding that but for counsel's unprofessional errors, the result of the trial would have been different, satisfying Strickland's second prong. The PCR court properly focused on how the integrity of the adversarial process was compromised by counsel's objectively ineffective representation, depriving the jury of the opportunity to consider the testimony of defendant's alibi witnesses. Counsel's ineffectiveness prejudiced defendant, leading to his guilty plea. In so proceeding, counsel's actions led to breakdown of the adversarial process and an unreliable result. The PCR court's ruling nullified that unreliable result.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3217-22