**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2995-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ANGEL M. ALICEA,

    Defendant-Appellant.

_____

Submitted April 3, 2025 – Decided April 28, 2025

Before Judges Natali and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 07-06-2114.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Kisha M. Hebbon, Designated Counsel, on the brief).

Grace C. MacAulay, Camden County Prosecutor, attorney for respondent (Kevin Hein, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

This matter is returned to us after a remand to the Law Division for an evidentiary hearing on defendant Angel Alicea's petition for post-conviction relief (PCR).  State v. Alicea, No. A-002214-16 (App. Div. June 19, 2019).  A different judge conducted the evidentiary hearing and denied PCR in a March 31, 2023 order and oral opinion.[1]

On appeal, defendant renews his claims his trial counsel provided ineffective representation, specifically arguing:[2]

> THE TRIAL COURT ERRED IN DENYING DEFENDANT'S PETITION FOR [PCR] BECAUSE THERE WAS SUFFICIENT EVIDENCE PRESENTED DURING THE EVIDENTIARY HEARING TO PROVE THAT DEFENDANT WAS DENIED THE RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL DUE TO TRIAL COUNSEL'S FAILURE TO INVESTIGATE TWO POTENTIAL WITNESSES AND TO CALL THOSE TWO WITNESSES AT TRIAL.
>
> [A].  Trial Counsel Rendered Ineffective Legal Representation By Virtue of His Failure To Investigate Two Potential Witnesses And To Call Them At Trial.

---

[1]  The order is incorrectly dated March 31, 2022.

[2]  We have reconstituted defendant's point headings to remove reference to the applicable legal standards.

Having considered the record developed at the evidentiary hearing against the applicable legal principles, we affirm.

We incorporate by reference the facts and procedural history set forth at length in our initial PCR opinion, see Alicea, slip op. at 3-13. For context, we detail the relevant facts from that opinion, and those elicited at the evidentiary hearing.

On June 20, 2007, a Camden County grand jury returned an eleven-count indictment, including a charge for first-degree murder, against defendant and his brother, co-defendant Joey Alicea. The charges stemmed from what the State alleged was an early morning revenge shooting on June 4, 2006, in the area of Mount Ephraim Avenue and Thurman Street in Camden. Multiple shooters fired into a large crowd resulting in injuries to six victims, including one death.

At trial, and as relevant to this appeal, the State relied upon the testimony of two eyewitnesses, Jamal Gibbs and Lorraine Fitzsimmons. Gibbs observed the shooting and was incarcerated at the time of trial. According to his testimony, although he did not hear what defendant and his brother were saying to each other, he saw defendant "ready to get rowdy." He further testified he witnessed defendant carrying two revolvers and saw him start shooting.

A-2995-22

Fitzsimmons, one of the victims of the shootings, testified she saw three shooters including a man named "Phil," and identified defendant and his brother as two of the shooters. Although Fitzsimmons stated she saw only Phil with a gun and did not see either defendant or his brother holding a firearm, she did testify she saw "sparks" coming from the area where defendant and his brother were standing.

Exposing the unreliability of the State's witnesses' testimony, particularly Gibbs', was a central part of defense counsel's trial strategy. As he stressed during his opening statement, counsel argued "[e]very single one of the witnesses that are going to be called has given several statements, has lied to the police under oath and then recanted and told another story, or they're sitting in jail waiting for a sentence, and they've been sitting in jail for two years." With respect to Gibbs, defendant's counsel emphasized he was scheduled to be sentenced on a drug charge the week after defendant's trial and was incarcerated "for attempted murder that hasn't been brought to trial yet."

After the State rested and the trial judge denied defendant's motion for a judgment of acquittal, Rule 3:18-1, defendant entered into a negotiated plea with the State in which he agreed to plead guilty to first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1). The State agreed to dismiss the

A-2995-22

remaining charges in the indictment and recommended the court sentence defendant to a term of twenty-one years, subject to an eighty-five percent period of parole ineligibility and five years of parole supervision, as mandated by the No Early Release Act, N.J.S.A. 2C:43-7.2. At his plea hearing, defendant provided a factual basis for his plea in which he admitted on the date of the shooting he was present at the scene with a handgun; he discharged the handgun; "it didn't matter to [him] whether anyone lived or died" as a result of him firing the weapon; and "as a result[, a victim] was struck with a projectile and [they] died as a result" of his actions. The court accepted the plea agreement and sentenced defendant accordingly.

On direct appeal, defendant challenged only his sentence which we considered on an excessive sentencing calendar pursuant to Rule 2:9-11. We rejected defendant's contentions that his sentence was manifestly excessive or unduly punitive and affirmed. State v. Angel M. Alicea, No. A-5534-09 (App. Div. Dec. 15, 2010).

Defendant subsequently filed a timely pro se PCR petition alleging ineffective assistance of counsel. His assigned counsel argued his trial counsel was constitutionally ineffective by failing to interview two individuals known

5

to have personal knowledge of facts related to the shooting, Nicole Moody and Frederick Purnell, and included their certifications.

Moody attested:

> 2.     In the early morning of June 4, 2006, I was in Camden . . . on or around the intersection of Mount Ephraim Avenue and Thurman Street.
>
> 3.     I [was] just outside of the Crown Fried Chicken restaurant near the intersection of Mount Ephraim Avenue and Thurman Street when I heard gun[] shots.
>
> 4.  I saw the person who was firing the shots.  He was a [B]lack male.  He was wearing a white tee shirt and blue pants.  He had low cut hair.  He was average height – not tall and not short.  He had a solid build – not skinny and not fat.
>
> 5.  I provided a description of the shooter to the Camden Police on the same day as the shooting.  The description in paragraph [four] was the description I provided to the authorities.
>
> 6.  I know [defendant].  I knew [defendant] prior to June 4, 2006.  I am certain that [defendant] was not the person I saw firing a gun on June 4, 2006.
>
> 7.  After I spoke to the police on June 4, 2006[,] no one ever contacted me again about the shooting.
>
> 8.  No one representing [defendant] ever contacted me about the shooting on June 4, 2006.
>
> 9.  I would have been willing to speak to an investigator or defense attorney representing [defendant] if I had been contacted.

6

10.  I would have been willing to appear at the trial of [defendant] and testify to what I told the Camden police and set forth above if I had been called as a witness.

11.  I am still willing to appear and testify as a witness concerning the shooting on June 4, 2006[,] if called to do so.

For his part, Purnell certified as to the following facts with respect to Gibbs:

2.  In the year 2008 or 2009 I was incarcerated in the Camden County jail.  [Defendant] was my cellmate during part of the time I was in the Camden [C]ounty jail.

3.  Jamal Gibbs was also in the Camden jail with myself and [defendant] during this time.

4.  For a period of time Jamal Gibbs was being housed on the same tier as [defendant] and I.  Gibbs' cell was very close to the cell I shared with [defendant].

5.  I have personal knowledge that Jamal Gibbs was cooperating with the police by providing information about other inmates.

6.  I have personal knowledge that Jamal Gibbs was providing information to the police about [defendant].

7.  I have personal knowledge that Jamal Gibbs was taking information he got from reading the newspaper and telling it to the police as information for which he claimed to have direct knowledge.

7

8.  No one representing [defendant] ever contacted me about the information that Jamal Gibbs was telling the police about [defendant]. . . .

9.  I would have been willing to speak to an investigator or defense attorney representing [defendant] if I had been contacted.

10.  I would have been willing to appear at the trial of [defendant] and testify about the information I provided above about Jamal Gibbs if I had been called as a witness.

As noted, the first PCR court denied defendant's petition, and we reversed and remanded for an evidentiary hearing.  Alicea, slip op. at 16-18.  With respect to Moody's certification, we concluded her account of the incident could have "significantly undermined the State's case," and defendant was "entitled to ask trial counsel to explain, under oath, why he failed to assign an investigator to interview [her]."  Id. at 16-17.  As to Purnell, we similarly found an evidentiary hearing was necessary to determine whether defendant's trial counsel was aware of Purnell's willingness to testify and undermine the credibility of Gibbs and, if he was, the PCR court must "determine the reasonableness of any explanation counsel may offer in support of his decision not to assign an investigator to interview Purnell."  Id. at 17.

A-2995-22

The second PCR court held an evidentiary hearing at which defendant's trial counsel and Moody testified.[3] Counsel explained he initially believed there were three shooters because the ballistics evidence revealed casings from a nine-millimeter (mm) weapon and "two different .38 projectiles, meaning fired from two different firearms." He further stated defendant did not agree with his initial theory of the case and "did not like" him, "did not trust" him, and questioned him "at every turn."

With respect to Moody and Fitzsimmons, whose statements to the police he possessed, defendant's counsel testified he discussed them with defendant before trial and explained they "both described a shooter different from [defendant] and his brother. They described one [Black] male." Because the evidence at the time pointed to three shooters, counsel stated he informed defendant those statements did not eliminate him as a shooter.

Defendant's counsel further explained he chose not to interview Moody or hire an investigator to interview her because he possessed her statement to the police and it did not help defendant "in that it took one shooter out where there were at least two or three involved." In other words, Moody may have been able

---

[3] Purnell did not testify at the PCR hearing because defendant's counsel was unable to locate him. Additionally, defendant chose not to testify.

A-2995-22

to eliminate defendant as the one shooter she witnessed, but her statement did "nothing for one or the other two, absolutely nothing." With respect to Purnell, counsel explained he chose not to interview him because the claim Gibbs was getting his information from the news did not make any sense because "[y]ou don't get the information that Gibbs was saying through news sources."

Further, counsel stated the State called a ballistics expert at trial who "tried to hone it into two shooters" and that testimony "was good for [defendant] because now we're only down to two shooters with . . . Fitzsimmons having already eliminated one of them." At that point in the case, counsel explained his strategy "was to put blame on [defendant's] brother, which [defendant] was completely, adamantly against[,] but [defendant's counsel] told him that [his] job was to represent [defendant], that [defendant's] brother had a competent lawyer," and his obligation was to "have [defendant] exonerated even if it mean[t] blaming his brother."

Counsel further testified he believed Fitzsimmons' and Gibbs' testimonies "utterly destroyed the government's case." Because none of the State's witnesses were "clean," defendant's counsel explained he did not want to call Moody as a witness because Fitzsimmons, as a State witness, already established Phil was

10

one of the two shooters and Moody would come across as a "defense witness" without providing any new information.

With respect to Purnell, although he was aware of him as a potential witness, counsel felt his testimony was unnecessary to discredit Gibbs because "he basically imploded on the stand." He did not want to call another incarcerated individual to testify on defendant's behalf because Purnell would be a "polluted source" and he did not want to argue to the jury they should not believe an incarcerated individual who has a motivation to lie, "and then suddenly call somebody who also happens to be in jail."

The State offered both defendant and his brother pleas and defendant's brother was prepared to accept the State's offer. At that point, counsel told defendant "it takes his brother out. . . . It means that even though [he was] not allowed to . . . suggest to a jury that [defendant's brother] was out because he pled guilty, . . . [w]hen the jury sees him from the room they're going to get that idea without [defendant's counsel] even saying anything." He explained defendant not only opposed his strategy, but he was also against his brother pleading guilty without him pleading guilty as well.

Counsel testified he informed defendant the State rarely offers pleas mid-trial and it must have thought "there's something wrong" or it was "not going

11

well for them." While he told defendant "this is our time to get you off of this thing," defendant insisted on pleading guilty. Finally, before defendant pled guilty, counsel testified he asked him "are you sure this is what you want to do, because you can't undo this?"

In response to the court's questioning regarding defendant's decision to accept the State's plea offer, counsel explained defendant "was just taking it, period. He was just saying, all right, I'll take it. It wasn't even a matter of convincing [defendant]. Once his brother decided to plead[,] he was going to plead."

For her part, Moody testified she did not see defendant present at the shooting and gave an initial statement to police in which she identified the shooter as "[a B]lack male, short hair cut, white tee shirt, blue jeans." On cross-examination, however, Moody conceded she told investigators she heard more than one gunshot and the scene was chaotic after the shooters opened fire into the large crowd.

As noted, on March 31, 2023, the second PCR court denied defendant's petition, issued a conforming order that same day, and thoroughly explained its reasoning in an oral decision. The court concluded defendant failed to satisfy either the performance or prejudice prongs of the two-part test to establish a

claim of ineffective assistance of counsel under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

With respect to the performance prong, the court found defendant's counsel's performance was not deficient. In doing so, it credited his testimony and observed he "had an unbelievably clear memory of what was done."

The court found it was "sound strategy" for him not to investigate or call Moody as a witness. The court further explained "Fitzsimmons . . . was a strong witness for [the] defense in providing similar exculpatory testimony to the testimony that would have been given by . . . Moody."

As to Purnell, the court found credible defendant's counsel's testimony that he chose not to call Purnell because he "would . . . undercut[] the case theory that he had argued in his opening statement if he had brought [Purnell] in to impeach Gibbs." Additionally, the court noted counsel "reviewed what was provided by the State's discovery for [Moody and Purnell], and relied on this information to exclude them from his own case-in-chief."

With respect to <u>Strickland</u>'s prejudice prong, the court explained it "place[d] great weight" on this factor and concluded "[t]here [was] simply no connection that ha[d] been credibly advanced by the defendant to establish that but for counsel's conduct [he] would not have accepted the plea." The court

13

noted defendant "did not testify in the evidentiary hearing and his [PCR] attorney spoke very broadly [about] what might have been going through his mind. . . . [Defendant] had no duty to testify . . . but there is certainly a lack of connection between the record and [counsel's] trial preparation and the guilty plea . . . ."

Second, the court explained the evidence suggested defendant "felt strong ties to his brother, and they were going to make the same choice to plead guilty." Third, the court noted defendant's plea colloquy in which he indicated he was "satisfied with [his counsel's] services," and counsel answered all of his questions. The court explained defendant accepted the plea against his counsel's wishes who "made clear to . . . defendant that a plea agreement cannot be undone," and defendant "indicated [his counsel] did not apply any pressure or coercion to get him to plead guilty."

Finally, the court specifically addressed our remand instructions and found defendant's counsel could not reasonably be faulted for failing to call Moody at trial because defendant insisted on pleading guilty before he could present his case and she was included on the witness list. Additionally, the court found counsel's performance was not constitutionally ineffective for not interviewing Moody because she offered essentially the same facts as

14

Fitzsimmons. Notably, the court credited counsel's testimony he made a reasonable strategic choice to avoid presenting Moody as a defense witness. With respect to Purnell, the court concluded counsel similarly made a "wise decision" when he decided not to call Purnell as a witness because Gibbs had already been impeached on cross-examination and calling Purnell could have "turned into a messy exchange between two inmates."

Our review of an order granting or denying PCR involves consideration of mixed questions of fact and law. State v. Harris, 181 N.J. 391, 415-16 (2004). After a court has held an evidentiary hearing, we defer "to a PCR court's factual findings based on its review of live witness testimony[,]" and will uphold findings that are "supported by sufficient credible evidence in the record." State v. Nash, 212 N.J. 518, 540 (2013). However, "we need not defer to a PCR court's interpretation of the law[,]" which we review de novo. Id. at 540-41.

To establish a prima facie claim of ineffective assistance of counsel, a defendant must show: (1) counsel's performance was deficient; and (2) the deficiency prejudiced the defense. Strickland, 466 U.S. at 687; State v. Fritz, 105 N.J. 42, 58 (1987). The Strickland test applies to challenges to guilty pleas. Hill v. Lockhart, 474 U.S. 52, 58 (1985). A defendant must establish that their attorney failed to provide advice that "was within the range of competence

demanded of attorneys in criminal cases." Id. at 56 (quoting McMann v. Richardson, 397 U.S. 759, 771 (1970)).  A defendant also must show "there is a reasonable probability that, but for counsel's errors, [they] would not have pleaded guilty and would have insisted on going to trial." Id. at 59.

Guided by these principles, we discern no grounds for reversal and affirm substantially for the reasons stated by the second PCR court in its comprehensive March 31, 2023 oral decision.  We provide the following comments to amplify our reasoning.

First, we find defendant's argument his counsel was constitutionally ineffective for failing to call Moody and Purnell without merit.  As the second PCR court noted, defendant pled guilty against his counsel's advice after the State rested.  Therefore, counsel never had the opportunity to call those witnesses.

Second, we find defendant's failure to investigate claims unpersuasive. With respect to Moody:  her account was cumulative because she simply identified the same shooter as Fitzsimmons; she would not have eliminated defendant as either the second or third shooter; she conceded the scene was chaotic and she did not see everyone in the large crowd; and as the second PCR court recognized, she was not a disinterested witness "as she appeared to be

16

close friends with [defendant's brother] and also kn[ew]" defendant. As it pertains to counsel's decision not to interview Purnell, counsel testified and reasonably concluded Gibbs was untruthful because the information Gibbs provided to the State was not information that could be gathered from the news and, as the second PCR court found, calling him as a witness would have undermined counsel's strategy of casting doubt on the testimony of incarcerated individuals, as evidenced by his opening statement.

Finally, defendant's claim he was prejudiced by counsel's representation because he would not have pled guilty had Moody's and Purnell's statements been investigated and they were called as witnesses at trial is unsupported by any competent evidence in the record. According to counsel's testimony at the evidentiary hearing, which the court found credible, it was defendant who insisted on pleading guilty despite his counsel's advice. Defendant did not testify at the evidentiary hearing and offered no competent evidence to rebut counsel's testimony. Therefore, his claim he would have rejected the State's plea offer and insisted on trying his case to verdict, where he faced a significantly greater sentence if convicted, amounts to nothing more than a mere bald assertion. See State v. Gaitan, 209 N.J. 339, 376 (2012).

A-2995-22

To the extent we have not addressed defendant's remaining arguments, we find they lack sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division