# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1387-24

STATE OF NEW JERSEY,

     Plaintiff- Respondent,

v.

P.M.,[1]

     Defendant-Appellant.

_____

> Submitted April 28, 2026 – Decided May 12, 2026
>
> Before Judges Gilson and Perez Friscia.
>
> On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 13-01-0136.
>
> Jennifer N. Sellitti, Public Defender, attorney for appellant (David A. Gies, Designated Counsel, on the briefs).
>
> Andrew B. Johns, Gloucester County Prosecutor, attorney for respondent (Michael C. Mellon, Assistant Prosecutor, on the brief).

---

[1] We use initials and pseudonyms to protect the privacy of the victim. See R. 1:38-3(c)(12).

PER CURIAM

Defendant P.M. appeals from the November 21, 2024 order denying his petition for post-conviction relief (PCR) after an evidentiary hearing. Defendant contends he demonstrated ineffective assistance of counsel (IAC), warranting the reversal of his convictions and sentence. Having reviewed the record, parties' arguments, and applicable law, we affirm.

I.

This matter returns to us after we reversed and remanded the PCR judge's (first judge) May 16, 2018 order denying defendant's PCR petition without an evidentiary hearing. See State v. P.M. (P.M. II), No. A-4704-17 (App. Div. Feb. 3, 2020) (slip op. at 8). We remanded the matter for a review of defendant's self-represented PCR arguments that were not addressed. Id. at 3. In 2016, on defendant's direct appeal after a jury trial, we had affirmed his conviction for second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1) (count one), and fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b) (count two), but remanded for the sentencing court to merge counts one and two and to amplify its reasons for imposing the Sex Crime Victim Treatment Fund penalty. State v. P.M. (P.M. I), No. A-1882-14 (App. Div. Oct. 3, 2016) (slip op. at 20).

A-1387-24

We limit our recitation of the facts and procedural history to the issues raised on this appeal. On December 17, 2011, defendant and his wife, B.M., hosted a Christmas party at their home. A.G., B.M.'s daughter and defendant's stepdaughter, resided at the home with her child. A.G. was twenty-one years of age at the time and attended the party, "drinking spiced rum shots" that defendant "suppl[ied]." Defendant was also drinking alcohol heavily.

Because A.G. consumed excessive amounts of alcohol, she began "throwing up." After going to sleep in her bedroom, A.G. awoke "lying on her back" with defendant "on top" of her, "penetrating" her vaginally. She was initially unsure "if it was [her] boyfriend," but she realized it was defendant and told him to stop. This occurred at about 4:00 a.m. After defendant stopped, A.G. called her boyfriend crying and reported what happened. Her boyfriend then notified the West Deptford Township Police Department (WDPD).

After the police arrived at about 7:00 a.m., A.G. was taken to the hospital and a sexual assault nurse examiner, Tiffany Gendron, completed a "rape kit." WDPD Sergeant Michael Pfeiffer briefly spoke with A.G. before the nurse's evaluation and thereafter responded to the residence. Pfeiffer collected the bed linens and a pair of underwear from A.G.'s bedroom. Defendant provided Pfeiffer with a buccal swab from the inside of his cheek, which was "packaged,

sealed[,] and . . . transferred to the [State Police Office of Forensic Sciences (OFS)] lab" with swabs collected from A.G.'s hospital examination. Pfeiffer testified on cross-examination that the OFS's lab results were received in March 2012 and "additional testing" was necessary, which did not occur until July 2012. After the OFS determined A.G.'s samples contained defendant's DNA "on the rectal swab extracted," he was charged and arrested.

At trial, Gendron testified "as an expert in [the field of] sexual assault forensic examinations." Gendron described performing A.G.'s external genital exam and observing redness near A.G.'s vaginal canal. Gendron explained the process of swabbing A.G.'s "external genital area" as well as her vaginal wall, cervix, and rectum.

Annette Estilow, a forensic scientist with the OFS, testified as an expert in the field of the "detection of bodily fluids." Estilow had examined A.G.'s swabs for "the presence of spermatozoa." Estilow testified within a reasonable degree of scientific certainty that four separate swabs were positive for containing spermatozoa: two vaginal swabs, one cervical swab, and one rectal swab. She explained the DNA analysis on the swabs was done separately in the "DNA laboratory."

Jennifer Banaag, a forensic scientist with the OFS, testified as "an expert in DNA." She explained that everyone "has a unique DNA profile except for identical twins." She described the standard four-step DNA process based on "polymerase chain reaction . . . technology," which involves "extraction," "quantitation," "polymerase . . . reaction," and a "genetic analysis" to "graph . . . different locations." After receiving A.G.'s four swabs containing spermatozoa, Banaag tested them for DNA against defendant's buccal swab control sample. She determined within a reasonable degree of scientific certainty that the generated "sperm cell" DNA "profile on [A.G.'s] rectal swab" was defendant's. Banaag attested she was able "to get a single profile" from "the sperm cell fraction," "which was a male profile," and she was able to "identify [defendant] as the source of that profile."

On cross-examination, defense counsel asked Banaag whether an additional mixture of DNA existed on the rectal swab and if defendant "was excluded as a possible contributor." Banaag responded, "Yes. [Defendant] was excluded as a possible contributor to the mixture." Banaag revealed on re-direct that there was "a sperm cell fraction which would contain the male portion of DNA, and then the non-sperm cell fraction which would contain the female

A-1387-24

portion." "[I]n the non-sperm cell fraction," A.G. "was identified as the source of the major or the predominant DNA profile in that mixture."

Bridget Verdino, a forensic scientist with the OFS, testified as an expert "in the field of toxicology." Verdino "performed a blood alcohol concentration [(BAC)] analys[i]s on [A.G.'s] blood" sample. After determining that A.G.'s blood sample taken at 11:15 a.m. had a BAC of .075, Verdino calculated A.G.'s BAC would have been approximately "0.31" at 3:00 a.m.

Defendant testified that during the Christmas party, he consumed many different alcoholic beverages, including tequila, whiskey, rum, and other assorted drinks. He recalled drinking heavily and having a disagreement with A.G. about missing money. However, the last thing defendant remembered was drinking a "shot" of alcohol that "burn[ed] [his] throat." He did not recall going into A.G.'s bedroom or having sex with her after the party.

During summation, defense counsel argued that on the night of the alleged sexual assault, defendant did "so much drinking that he d[id not] remember most of the night." Regarding corroborating observations of defendant's intoxication, defense counsel highlighted defendant "appeared drunk when [the guests] arrived." Defense counsel asked the jurors to use common sense and consider the testimony that defendant did not "remember having sex," consumed alcohol

6

"to excess," and that "he really went overboard." Defense counsel emphasized defendant "d[id not] even remember anything about what happened that night."

The jury convicted defendant on both counts. Defendant was sentenced on count one to seven years in prison, subject to a mandatory eighty-five percent period of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2, and parole supervision for life. The trial judge sentenced defendant on count two to a term of one year, to run concurrent with count one.

After we remanded defendant's PCR petition, a different judge (second judge) held a two-day evidentiary hearing because the first judge had retired. Defendant, B.M., and defendant's trial counsel, Leonard Grasso, Esq. testified at the hearing.

On June 14, 2024, defendant testified that Grasso never provided or discussed "the discovery" with him and only offered limited information regarding the State's DNA evidence. Defendant alleged Grasso provided only "a single sheet" of paper concerning the DNA, which he understood was the "detail about the DNA itself." He maintained Grasso was ineffective for failing to recognize it was highly relevant that there was "no DNA . . . inside or around [A.G.'s] vagina" and therefore "the DNA evidence . . . [was] moot at that point." Defendant also believed Grasso was ineffective in pursuing an alternative

defense. He asserted the DNA evidence was only found "on the cheek of [A.G.'s] butt, the evidence presented show[ed] that [he] had . . . sex with [his] wife that particular night," and his wife should have been "tested . . . for the [DNA] mixture."

Defendant believed it was possible he failed to recall that A.G. went to "the bed [where he was] passed out" and "sat on [him] . . . after [he made] love to [his] wife" because he was so intoxicated. Regarding Grasso's questioning of A.G., defendant asserted it was ineffective because Grasso should have questioned A.G. about "the DNA . . . on her buttocks." Further, he posited Grasso committed IAC by focusing the trial strategy on an intoxication defense.

B.M. testified that she met with Grasso one time and had a separate "three-way [phone] call" that included defendant's sister. B.M. remembered Grasso "said that the drinking [defense] was the best way to go." B.M. further maintained she and defendant asked Grasso for discovery about "three different times" but never received it. She alleged, on the night in question, defendant woke her up while she was sleeping with her grandchild. They went into "the next room . . . [and] had sex" at about 6:00 a.m. She alleged defendant was intoxicated and needed assistance in getting aroused.

8                                                                A-1387-24

On August 8, 2024, Grasso testified that defendant retained him "a few days after" the charges and he met with defendant several times, including with B.M. "[a] couple of times." He evaluated the facts of defendant's case, based on his years of experience. Grasso informed defendant that the best trial strategy was to proceed with an intoxication defense and to challenge A.G.'s credibility. During a meeting with defendant, Grasso discussed the discovery. Additionally, he explained to defendant the possible defenses, including the argument that if the event happened, defendant was too drunk to know it happened.

Grasso recalled not asking B.M. about sexual relations on the night in question because defendant advised he "did not have sex" with his wife. He maintained "[t]he biggest part of [the] defense was . . . intoxication" because "there was quite a bit of alcohol consumed by" defendant's account and people at "the party . . . were able to confirm" his excessive alcohol consumption.

Regarding the DNA evidence, Grasso testified about his DNA experience, noting his first DNA case was in 1993. Grasso recounted that the State's DNA evidence informed his judgment regarding trial strategy. He decided not to have "independent[] [testing] done" based on his "review and . . . experience," because it would not have "help[ed]."

Grasso steadfastly maintained he discussed the DNA evidence with defendant. Referencing his criminal law practice of almost thirty years, Grasso asserted he reviewed all the discovery with defendant as he did with every client. Grasso stated they "went over everything that was in the file." He gave a detailed description of his strategy and preparation for trial, including the decision to present an intoxication defense because the facts showed defendant "was truly impaired."

On November 21, 2024, the second judge issued an order accompanied by a cogent and thorough fifty-three-page written decision, which denied defendant's PCR petition. The second judge distinguished between the separately filed claims by PCR counsel and defendant, self-represented. Additionally, the second judge reviewed defendant's petition under the PCR framework established under the court rules and the two-prong IAC test enunciated in Strickland v. Washington, 466 U.S. 668, 687 (1984), as adopted by our Supreme Court in State v. Fritz, 105 N.J. 42, 58 (1987).

Regarding credibility, the second judge credited Grasso's testimony and found defendant was not "believable." The second judge noted defendant's testimony was self-serving and unsupported. Specifically, the second judge stated defendant's assertions were "incredulous" and "bald assertions," including

the allegations that Grasso "never met with him," failed to "discuss[] the discovery," and did not "review[] trial strategy." Further, he found defendant "provide[d] no specificity" with the allegations that: "person[s], place[s], or thing[s] should have been investigated," "expert[s] should have been retained," and Grasso failed to review the "DNA reports." Regarding B.M.'s testimony, the second judge found she showed bias and was not credible.

After observing Grasso's testimony, the second judge noted the depth of Grasso's recollection and the substance of his credible testimony that wholly refuted defendant's contentions. Grasso clearly had "reviewed all the discovery with . . . [defendant]" and made the strategic decision to proceed with "an intoxication defense." The second judge recognized Grasso's strategic decisions are afforded a strong presumption of validity, finding defendant failed to rebut the presumption after an evidentiary hearing.

The second judge specifically found Grasso apprised defendant of the DNA evidence and the strategic decision to pursue the intoxication defense after consideration of the possible defenses against the evidence. Recognizing the strength of the DNA evidence, the second judge highlighted Grasso pursued a supportable defense. The second judge stated, "[D]efendant failed to establish [a reliable fact supporting] how the DNA evidence was faulty." After each

petition claim was copiously evaluated, the second judge found defendant failed to show IAC. The second judge stated that defendant demonstrated no support or corroboration for his assertions. Further, defendant's speculative claims of IAC failed against Grasso's accepted reasonable trial strategy and defendant's speculative defenses would have been contrary to an intoxication defense, which was soundly supported. This appeal followed.

On appeal, defendant raises the following points:

> POINT I
>
> THE PCR JUDGE ERRED WHERE HE DETERMINED THAT DEFENSE COUNSEL'S STRATEGY DECISIONS WERE APPROPRIATE ALTHOUGH THE TRIAL ATTORNEY DID NOT CONSULT AN EXPERT TO REVIEW THE DNA EVIDENCE.
>
> POINT II
>
> THE TRIAL ATTORNEY'S DECISION NOT TO CONSULT AN EXPERT TO REVIEW THE DNA EVIDENCE, ILLUSTRATED BY HIS FAILURE TO EFFECTIVELY CROSS-EXAMINE THE STATE'S DNA EXPERT, PREJUDICED DEFENDANT'S RIGHT TO A FAIR TRIAL.
>
> POINT III
>
> PCR COUNSEL'S FAILURE TO CONSULT AN INDEPENDENT DNA EXPERT WARRANTS A REMAND.

## II.

"Our review of a PCR [judge]'s factual findings" after it conducts an evidentiary hearing "is 'necessarily deferential.'" State v. Hernandez-Peralta, 261 N.J. 231, 246 (2025) (quoting State v. Nash, 212 N.J. 518, 540 (2013)). "An appellate court's reading of a cold record is a pale substitute for a trial judge's assessment of the credibility of a witness he has observed firsthand." State v. Gideon, 244 N.J. 538, 562 (2021) (quoting Nash, 212 N.J. at 540). Therefore, when a PCR judge holds an evidentiary hearing, we should "uphold the PCR [judge]'s findings that are supported by sufficient credible evidence in the record." Id. at 551 (quoting Nash, 212 N.J. at 540). "However, we review a PCR court's legal conclusions de novo." Hernandez-Peralta, 261 N.J. at 246; see also State v. Harris, 181 N.J. 391, 415-16 (2004).

To succeed on an IAC claim, a defendant must satisfy both prongs of the test set forth in Strickland, 466 U.S. at 687, as adopted by Fritz, 105 N.J. at 58, by a preponderance of the evidence. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. The PCR court "must indulge a strong presumption that counsel's conduct falls within the

wide range of reasonable professional assistance," and "the defendant must overcome the presumption that, under the circumstances, the challenged action [by counsel] 'might be considered sound trial strategy.'" Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

Under the second prong of the Strickland test, the defendant must show "the deficient performance prejudiced the defense." Id. at 687. This means "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Ibid. It is insufficient for the defendant to show the errors "had some conceivable effect on the outcome." Id. at 693. When petitioning for PCR, the defendant must establish, "by a preponderance of the credible evidence," entitlement to the requested relief. Nash, 212 N.J. at 541 (quoting State v. Preciose, 129 N.J. 451, 459 (1992)). "'To sustain that burden, specific facts' which 'would provide the court with an adequate basis on which to rest its decision' must be articulated." State v. Hand, 480 N.J. Super. 15, 26 (App. Div. 2024) (quoting State v. Mitchell, 126 N.J. 565, 579 (1992)).

III.

Defendant first contends the second judge erred in failing to find defense counsel's strategic decisions and failure to consult a DNA expert were ineffective. He posits Grasso's "pretrial investigation of the facts[,] which

would reasonably support an intoxication defense[,] was inadequate." Additionally, defendant maintains that if Grasso had consulted a DNA expert, he likely would have been acquitted given it was the "only physical evidence."

There is "'a strong presumption' that [counsel] provided reasonably effective assistance" and counsel's "decisions followed a sound strategic approach to the case." State v. Pierre, 223 N.J. 560, 578-79 (2015) (quoting Strickland, 466 U.S. at 689). "If counsel thoroughly investigates law and facts, considering all possible options, his or her trial strategy is 'virtually unchallengeable.'" State v. Savage, 120 N.J. 594, 617 (1990) (quoting Strickland, 466 U.S. at 690-91). In reviewing IAC claims, courts apply a strong presumption that a defendant's trial counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690. "[C]omplaints 'merely of matters of trial strategy' will not serve to ground a constitutional claim of inadequacy." Fritz, 105 N.J. at 54 (quoting State v. Williams, 39 N.J. 471, 489 (1963)).

"[O]nce a defendant has the assistance of counsel[,] the vast array of trial decisions, strategic and tactical, which must be made before and during the trial[,] rests with the accused and his attorney. Any other approach would rewrite the duties of trial judges and counsel in our legal system." State v.

Buonadonna, 122 N.J. 22, 38 (1991) (quoting Estelle v. Williams, 425 U.S. 501, 512 (1976)).  Further, courts defer to a trial counsel's decisions regarding the calling of witnesses to testify during trial.  State v. Arthur, 184 N.J. 307, 321 (2005); see also Pierre, 223 N.J. at 579 (recognizing the difficulty in determining which witnesses to call and holding a court should defer to a defense counsel's strategic decision whether to call a particular witness).

We are unpersuaded by defendant's assertion that Grasso's trial strategy was unsupported and his assessment of the facts corroborating an intoxication defense was inadequate.  The second judge's finding that Grasso credibly substantiated his trial tactics and decisions is amply supported by record.  Grasso testified that in reviewing the case, he learned individuals at the party corroborated defendant's claim of intoxication.  In fact, those witnesses testified at trial and A.G. did not refute defendant's claim that he heavily consumed alcohol.  Defendant has offered only a bald assertion that Grasso was ineffective for not knowing defendant's BAC.  Notably, Grasso was hired several days after defendant was accused of the sexual assault, prohibiting the ability to obtain his BAC.

Additionally, defendant's contention that Grasso failed to adequately explain why he focused "more on an intoxication defense than on [A.G.'s]

conduct that appeared to permit the sexual relations" is belied by the record. As found by the second judge, Grasso thoroughly explained that the trial strategy was based on a review of all the evidence and, more particularly, the corroborated evidence. The trial record also shows Grasso in fact raised questions about A.G.'s actions and credibility. Thus, we discern no error by the second judge.

We also reject defendant's assertions that Grasso committed IAC because he "did not consult a DNA expert," "did not challenge the only physical evidence connecting [defendant] to a sexual act[,] which he did not and does not recall," and "misunderst[ood] . . . the science of DNA evidence." Grasso had experience with DNA evidence, stemming back to 1993. Based on his evaluation of the strength of the facts and DNA evidence, he determined a DNA expert would not assist in the defense. Further, Grasso's professional opinion, based on his DNA knowledge, was that the DNA evidence against defendant was strong, which informed his recommended trial strategy to defendant. Sufficient credible evidence in the record supports the second judge's determination that defendant posited only speculative statements regarding Grasso's purported failures.

We also reject defendant's related contention that Grasso was ineffective in failing to consult an expert regarding the State's DNA evidence and as a result,

17

his cross-examination of Banaag at trial was ineffective. In challenging Banaag's "methodology," defendant maintains Grasso "did not question [her] . . . about the method[s] used to separate the sperm cell fraction from the non-sperm cell fraction extracted from the rectal swab." Defendant does not credibly posit that the collected DNA samples were contaminated or improperly handled. He only baldly asserts that "an effective cross-examination of the State's expert would have likely created doubt in light of the less than overwhelming evidence." Again, the second judge found Grasso's testimony credible and recognized his years of criminal trial experience, including particularized DNA evidence knowledge.

The record further demonstrates that, at trial, Grasso cross-examined Banaag regarding the "mixed DNA profile" but stopped short of providing the expert another opportunity to restate her conclusions that defendant's DNA was located on A.G.'s "rectal swab." Defendant provides no factual support establishing Grasso was deficient in failing to retain a DNA expert to better cross-examine the State's experts. Stated another way, defendant offers no specific facts showing Grasso failed to sufficiently cross-examine the State's expert and that he was deprived of a fair trial.

A-1387-24

As we have concluded defendant's IAC contentions are without merit, his remaining argument regarding the parameters of a remand for further review of the DNA evidence is moot and lacks sufficient merit to warrant additional discussion in a written opinion. R. 2:11-3(e)(1)(e).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division